[No. 29691. *En Banc.* August 24, 1945.]

THE STATE OF WASHINGTON, *on the Relation of Harry Livingston et al., Respondents,* v. ELLIS C. AYER, *as Auditor of Thurston County, Appellant.*[1]

[1]Reported in 161 P. (2d) 429.

*Neal, Brodie & Trullinger,* for appellant.

*Levy Johnson* and *E. A. Philbrick,* for respondents.

JEFFERS, J.—This cause came before the trial court on the application of relators, Harry Livingston, Joe C. Peters, and H. W. Bolender, county commissioners of Thurston county and, as such, members of the county statistics commission of Thurston county, for a writ of mandamus to compel Ellis C. Ayer, as auditor of Thurston county, to issue to relators and the other members of the commission the necessary warrants in payment of salaries, as provided by Laws of 1945, chapter 258, p. 801, and to deliver such warrants in the sum of $29.03 to each member for services performed in March, 1945, and in the sum of seventy-five dollars per month for each and every month thereafter during the period fixed in the act. The affidavit supporting the application was signed by Harry Livingston.

The following allegations of the affidavit were admitted in the return filed by respondent, Ellis C. Ayer, in answer to an alternative writ issued by the court:

Paragraph 1. That Thurston county is a municipal corporation of the fourth class, and that relators are the duly elected, qualified, and acting county commissioners of such county.

Paragraph 2. That Ellis C. Ayer is the duly elected, qualified, and acting auditor of Thurston county.

Paragraph 3. That the 1945 session of the Washington state legislature enacted a law which now appears as Laws of 1945, chapter 258, p. 801, entitled:

"An Act relating to veteran affairs and unemployment; preparation for rehabilitation and reconversion; creating employment statistics commissions; fixing their compensation; making an appropriation therefor; and declaring an emergency;"

that this law creates in each county of the state a county statistics commission composed of various county officers, prescribes their duties, and provides that the members of such commission shall be compensated by the respective counties at a specified statutory salary for the performance of those duties.

Paragraph 4 of the affidavit states:

"That said act contained an emergency clause providing that the same should be and become effective immediately upon its passage by the legislature and signing by the governor (and) that said act was so passed and was signed by the governor on the 20th day of March, 1945."

Respondent in his return admitted that the act contained an emergency clause and that the act was signed by the governor on March 20th. Respondent then alleged that there was in fact no emergency, that the legislature was without power to declare an emergency, and that the act did not become effective March 20, 1945, or at all.

It is alleged in paragraph 5 of the affidavit that immediately upon the taking effect of the law, the members of the statistics commission, as designated for Thurston county, met, organized, and entered upon the performance of the duties prescribed by the act; that the members of the commission for Thurston county are Harry Livingston, Joe C. Peters, H. W. Bolender, county commissioners, Ellis C. Ayer, auditor, Ray Cruikshank, assessor, Ruby Swan Young, treasurer, Paul Paulk, clerk, Frank C. Tamblyn, sheriff, Marvin S. Stevens, superintendent of schools, and Levy Johnson, prosecuting attorney; that the compensation desig-

hated for each member of the statistics commission of Thurston county is seventy-five dollars per month; that in accord therewith there became due and owing to each member of the commission on the first day of April, 1945, the sum of $29.03; that the county commissioners, relators herein, directed the auditor to issue warrants of Thurston county to each member of the commission in the sum of $29.03; that respondent, as auditor of Thurston county, has refused and continues to refuse to issue the warrants in payment of the salaries of the members of the commission, as directed by the county commissioners.

Respondent in his return admitted that the members of the purported commission met and attempted to organize and enter upon the performance of the duties prescribed by the act, admitted that the members of the commission are as alleged in paragraph 5, and admitted that the act attempts to designate that the compensation for each member of the commission shall be seventy-five dollars per month; but denied that there was due and owing to each member of the commission on April 1, 1945, the sum of $29.03, or any sum whatsoever. Respondent admitted that warrants have not been issued to relators or to the other county officers who are members of the commission, and alleged that this has not been done for the reason that the provisions of Laws of 1945, chapter 258, authorizing such compensation, are void because such compensation is prohibited by § 25, Art. II, and § 8, Art. XI, of the state constitution.

The matter came on for hearing before the court upon the pleadings, no evidence being introduced, and thereafter, on May 16, 1945, the court made and entered findings of fact in accordance with the allegations of relators' affidavit, from which the court concluded that relators and other members of the commission were entitled to the relief asked for, and judgment was entered accordingly. The reason for the conclusion reached by the trial court is found in the following memorandum opinion:

"Inasmuch as this court is being used only as an avenue of approach to the supreme court where an adjudication, final and safe for the various county auditors to act upon,

can be had; this court is extending to the legislative act that presumption of validity to which all such acts are entitled."

The auditor has appealed from the judgment entered, and will hereinafter be referred to as appellant. The relators will be referred to as respondents.

It is contended by appellant that the trial court erred in requiring him to issue and deliver to the respective county officers of Thurston county, as members of the county statistics commission of Thurston county, warrants for services claimed to have been performed by them, or any warrants for services claimed to have been rendered pursuant to the provisions of Laws of 1945, chapter 258; that the court erred in not dismissing this action.

Appellant in his brief divides his argument into two parts. In the first part he deals with the emergency feature of chapter 258. We may say frankly that, while we have grave doubts that this act is *in fact* necessary for the immediate preservation of the public peace, or for the immediate preservation of the public health, or for the support of the state government or its existing institutions, we have decided to express no opinion on the first question, in view of the fact that all the parties to this proceeding desire an expression by this court as to the constitutionality of chapter 258, in so far as it purports to authorize the payment of additional compensation to these county officers, as members of the county statistics commission.

Appellant contends that chapter 258 violates § 25, Art. II, and § 8, Art. XI, of the constitution of the state of Washington, in that it increases the salaries of the county officers of Thurston county during the term for which they and each of them were elected.

While the above sections have been before this court many times and are familiar to every member of the bar, we shall set them out herein:

Section 25, Art. II, provides:

"The legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor after

the services shall have been rendered or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office."

Section 8, Art. XI, provides:

"The legislature shall fix the compensation by salaries of all county officers, and of constables in cities having a population of five thousand and upwards, except that public administrators, surveyors, and coroners may or may not be salaried officers. The salary of any county, city, town, or municipal officer shall not be increased or diminished after his election or during his term of office, nor shall the term of any such officer be extended beyond the period for which he is elected or appointed."

Respondents and all the other officers of Thurston county who became members of the county statistics commission under the act, are not only county officers, but also public officers.

Chapter 258 was passed after each of the officers of Thurston county had been elected to the office he is now filling, and during the term for which he was elected.

Before setting out the provisions of chapter 258, we desire to call attention to another act passed by the 1945 session, as we think it has a bearing on the conclusion we have reached in this case. The act referred to is chapter 87, and was passed by the House and Senate March 6, 1945, and signed by the governor on March 15th. It was passed by the legislature as sub. house bill 101. By this act, the legislature increased the salaries of the elected county officers in all classes of counties. By this bill, in fourth-class counties the auditor, clerk, treasurer, prosecuting attorney, assessor, sheriff, superintendent of schools, and members of the board of county commissioners will receive thirty-two hundred dollars a year.

It is not, of course, contended that chapter 87 would affect the salaries of county officers during their present terms, or that it could apply to any such officer other than those elected after the effective date of the act.

Chapter 258, with which we are here concerned, was passed by the House and the Senate on March 7, 1945, or the

day after chapter 87 was passed, and was approved by the governor on March 20th, except as to §§ 6 and 7, which were vetoed. By chapter 258, the salaries of the elected county officers of Thurston county named in the act were increased nine hundred dollars a year, by making such officers members of a county statistics commission. Chapter 258 contained an emergency clause, thereby purporting to make the act effective immediately, and, according to the terms of the act, it was to expire on January 1, 1947, or approximately at the time chapter 87 would become effective, in so far as the present elected county officers are concerned.

We may say at the present time the salaries of the county officers of fourth-class counties are as follows: Auditor, clerk, prosecuting attorney, treasurer, assessor, sheriff, superintendent of schools, $2,250 a year; members of the board of county commissioners, $1,800 a year.

We have hereinbefore set out the title to chapter 258, and in order that we may have before us the provisions of the act, we quote it in full, in so far as it applies to fourth-class counties, it being understood that the act provides for county commissions in all classes of counties and provides for salaries for the members of such commissions in all counties.

"Section 1. As used in this act:

"(1) 'Service person' includes every person serving the United States in the army, navy, marines, nursing service, or transport service thereof and every person employed on behalf of the United States in war activity beyond the continental limits of the United States as of January 1, 1945; it also includes every person who has been honorably discharged from the army or navy of the United States since January 1, 1943;

"(2) 'Family' means a group of blood relatives occupying the same living quarters and includes adopted children;

"(3) 'Job' means employment of one person by another person at a fixed wage or on commission, but does not include casual employment;

"(4) 'Employment' means gainful occupation for at least twenty hours per week for at least four weeks per month;

"(5) 'Person' includes a corporation or any other organized group of natural persons.

"Sec. 2. In preparation for post war rehabilitation and reconversion, there is established in each county a County Statistics Commission.

"Sec. 3. The County Statistics Commission shall consist of: . . .

" (3) In counties of the fourth, fifth, sixth, seventh and eighth classes: the County Assessor, the County Auditor, the County Clerk, the County Commissioners, the Prosecuting Attorney, the Sheriff, the County Superintendent of Schools and the Treasurer; . . .

"Sec. 4. Immediately upon the taking effect of this act each County Statistics Commission shall organize by electing one of its members as Chairman and another as Secretary.

"Sec. 5. The County Statistics Commission shall prepare a separate record for each service person whose home address was in the county on January 1, 1945. This record shall show the name, age, and address of each service person, and the name and age of his wife and each of his children, all as of January 1, 1945. In case any service person is unmarried. the record shall show the names and addresses of his next of kin and the relationship each bears to him.

"This record shall also give the legal description of all real estate in the county owned by any service person on January 1, 1945, together with the amount of incumbrance thereon and the amount of the taxes levied thereon annually. . . .

"Sec. 8. The compensation to be paid the members of each County Statistics Commission shall be paid by the respective counties and the payment thereof is hereby declared to be a mandatory expenditure required by law. No resolution of the Board of County Commissioners need be adopted by any Board of County Commissioners, the provisions of this act being a sufficient declaration of emergency and mandate for all expenditures by all counties made and incurred.

"Sec. 9. All records required by the County Statistics Commissions to be kept, shall be kept upon forms to be furnished by the Division of Municipal Corporations in the office of the State Auditor and remain in the custody of the secretary of the County Statistics Commission in each county. The expense of preparing, printing and shipping the forms required by this act shall be paid from the money appropriated by this act.

"Sec. 10. Each County Statistics Commission shall employ such help, occupy such space and purchase such supplies, other than the forms furnished, as may be necessary, at the expense of each county as allowed by the Board of County Commissioners thereof.

"Sec. 11. The members of each County Statistics Commission shall receive for their services as such the following monthly compensation: . . .

"(3) In counties of the fourth class, seventy-five dollars ($75) per month; . . .

"Sec. 12. There is hereby appropriated from the General Fund the sum of fifteen thousand dollars ($15,000), or so much thereof as may be necessary, to the State Auditor for the purpose of printing and distributing forms for the use of the County Commissions.

"Sec. 13. This act shall expire January 1, 1947.

"Sec. 14. This act is necessary for the immediate preservation of the public peace, health and safety and for the support of the state government and its existing institutions and shall take effect immediately."

In order to show that by vetoing §§ 6 and 7 of the act, any usefulness the act might have had, in so far as its purpose is expressed in the title, was practically nullified, we shall set out the two sections:

"Sec. 6. After the record of a service person has once been set up, any change in rank, status, family relationship, ownership of real property, and taxes thereon, thereafter occurring shall be noted upon the record as soon as practicable after it occurs. Also on July 1, 1945, a survey shall be made for persons resident in the county who have become service persons since January 1, 1945, and similar records set up for them. Annually thereafter, similar surveys and similar additions shall be made to the records.

"Sec. 7. The County Statistics Commission in each county shall also prepare a separate record for each family residing within the county. The record shall show as of January 1, 1945, the family address, the names of the members of the family who have jobs, stating as to each the name and address of the employer, the character of the employment, and the average weekly income of each therefrom."

As the act now stands, the only duties required of the commission, outside of organizing, are those provided by § 5. The act does not purport to say what shall be done

with the record which the commission is to prepare, when or how it shall be prepared, other than on forms to be supplied by the state auditor, or to whom the information shall be available.

The act does not purport to say that any particular county officer shall do any particular part of the work, but, in our opinion, § 10 of the act clearly contemplates that whatever is done will be done by clerical help, the services of such help being paid for by the county.

Considerable is said in respondent's brief about postwar planning for veterans and their families and about the purpose and effect of this act, but we can find nothing in the act which in fact refers to or ties it in with any general program, or which would make it effective for any purpose other than to raise the salaries of the present county officers to practically the same amount as provided in chapter 87.

The question for our consideration comes down to this: Is chapter 258 void, in so far as it purports to authorize the payment of compensation to these county officers, as members of the county statistics commission, from county funds, for services performed and to be performed as members of such commission?

In approaching this question, we are mindful of the rule as to the presumption of constitutionality of legislative acts, and we are also mindful that it is not within the province of a court to question the wisdom of a legislative act. But we also have in mind the fact that when it becomes the duty of this court to pass upon the constitutionality of an act of the legislature, we must determine whether or not such act does *in fact* violate some provision of the constitution; and, in doing this, if the court performs its full duty, it will not shut its eyes to obvious facts which would compel a conclusion that the act is unconstitutional, and rest a decision that the act is constitutional upon the mere presumption of constitutionality, or upon the rule that we cannot question the wisdom of the legislature in passing the act, or upon some declared policy or purpose contained in the act, which policy or purpose cannot be substantiated.

It may be conceded, for present purposes, that unless forbidden or restrained by constitution or statute, the compensation of a public officer could be increased or diminished during his term or period of employment. It may also be conceded that the legislature may fix the salaries of county officers in the first instance, and has the right to change the salary or compensation from time to time when its application is made to officers whose terms of office commenced subsequent to the effective date of the statute. See *State ex rel. Henneford v. Yelle,* 12 Wn. (2d) 434, 121 P. (2d) 948.

Many cases have been before this court involving attempts to raise the salary of public officers during the term for which they were elected or appointed. While in our opinion none of the cases presents a factual situation such as is presented in the instant case, they all bear evidence of the fact that this court has zealously guarded against any attempted violation of § 25, Art. II, and § 8, Art. XI, of our constitution, by whatever method employed to accomplish that end. This court has recognized that, based upon expediency, evasive methods might be used to accomplish indirectly what could not be done directly.

As indicating the attitude of this court, we quote from the early case of *State ex rel. Davis v. Clausen,* 47 Wash. 372, 91 Pac. 1089, where, after referring to § 25, Art. II and § 8, Art. XI, we stated:

"So that it will be seen that it was a *positive policy of the constitution,* expressed in every possible way, that the *salaries of officers should not be increased during their term of office.* This wise provision was no doubt intended to prevent *pernicious activity* on the part of the office holders of the state being brought to bear upon the members of the legislature—a wise provision *which must not be construed out of existence or evaded* by legislative enactment." (Italics ours.)

In the cited case we also stated:

"The true intent of the legislature must be gathered from the whole scope of the enactment and the reasons which appear for making the enactment."

In *State ex rel. Funke v. Board of Commissioners*, 48 Wash. 461, 93 Pac. 920, after quoting § 8, Art. XI, of our constitution, we stated:

"It is manifest from the section quoted that the salary of a county officer cannot be increased during the term of office for which he is elected."

In the same case we further stated:

"Another section of the constitution must be considered in this connection. Section 25, art. 2, provides, among other things, as follows: 'Nor shall the compensation of any public officer be increased or diminished during his term of office.' The above provision is so comprehensive that interpretation seems wholly unnecessary. The proposition is so simple that the statement of it carries its own argument. This provision relates strictly to what the legislative department shall not do, and it is manifest that the two constitutional provisions must be read and construed together. If the term 'salary,' as used in the one, has a more restricted meaning than 'compensation,' as used in the other, then the more comprehensive term which applies to 'any public officer' must control here when we are considering what the legislature may or may not do. The term 'compensation,' as used seems to be broad enough to include any kind of remuneration from the public treasury for a public officer, whether by way of what is called 'salary' or otherwise."

Again we quote from the cited case:

"The increase of compensation by those statutes and also by the one now before us was, no doubt, in each instance a meritorious thing for the legislature to do, having reference to *future office incumbents*. But the constitutional provision as to *present incumbents* must not be so construed in the interest of *seeming expediency* or even apparent necessity *as shall practically amount to an evasion of the organic law*." (Italics ours.)

In *State ex rel. Port of Seattle v. Wardall*, 107 Wash. 606, 183 Pac. 67, a situation was presented where the legislature passed an act providing that port commissioners in port districts having a population of two hundred thousand or more should receive a compensation of three thousand dollars per annum. Prior to the passage of the 1917 act, no salary had been provided for port commissioners. After the passage

of the act the port commissioners of the Port of Seattle directed the county auditor of King county to draw warrants in payment of the salaries allowed by the act for December, 1918. The auditor refused to comply with the order, whereupon proceedings were instituted to compel him so to do. In the cited case, after quoting § 25, Art. II, and § 8, Art. XI, we stated:

"These provisions of the constitution, it may be premised, since they are prohibitory in their nature, are self-executing, binding alike upon the authority empowered to fix salaries or compensation of public officers, whether that authority be the legislature, a board or commission, or, as in this instance, the legislature with the concurrence of the electorate affected by the increase. It is plain, also, that these commissioners are public officers within the meaning of the constitutional inhibition. . . . It is further true, we think, that had the original act given the commissioners a mere nominal compensation, a substantial compensation, such as is here provided, would be an increase within the meaning of the constitutional provisions. The question for consideration is, therefore, simple in its elements. Since the commissioners are serving without compensation, is the award to them of a substantial compensation within the constitutional inhibition?

"In support of the enactment, the commissioners' learned counsel call attention to the rule that courts will not declare an act of the legislature to be violative of the constitution unless it is clearly and plainly so, and to the rule that every intendment is in favor of the constitutionality of the act, . . . They then argue that it is evident that the present case presents a condition not contemplated by the framers of the constitution; that the constitution speaks of an increase and decrease in salary or compensation; that, where nothing is granted, there can be no decrease, and that to grant something where nothing was granted before is not to grant an increase within the usual meaning of that term; . . .

"But, plausible as this reasoning may seem, we think it overlooks the purpose and intent of the constitutional inhibitions. These inhibitions, it will be observed, are wide in their application. They cover the case of every public officer holding by a fixed term, whether that officer be elected or appointed and whether his duties conduce much or little to the public welfare."

Then, after quoting from *State ex rel. Davis v. Clausen,* 47 Wash. 372, 91 Pac. 1089, which quotation we have heretofore set out, the court further stated:

"Other courts have said that such provisions also have an additional purpose, namely, to prevent the salary-fixing body from rewarding their friends and punishing their enemies, which they were sometimes wont to do, by increasing the salaries of those in favor and decreasing the salaries of those whose actions did not meet with the approval of that body."

The court then stated that it was as much a violation of the spirit and purpose of the constitutional provision to grant a salary where none was before provided as it was to increase an inadequate salary. Quoting further from the cited case:

"In other words, it is as much against the spirit and purpose of the constitution to permit public officers to solicit a salary during their terms where none has been provided, as it is to solicit an increase of a provided salary, since the one is as much a violation of the public policy involved as is the other."

We say quite frankly that, when it is considered that chapter 87 could not apply to these county officers during their present terms of office, that chapter 258 was passed the day after the passage of chapter 87, that chapter 258 contained an emergency clause purporting to make it effective immediately, thereby increasing the salary of these county officers by nine hundred dollars, or to an amount practically the same as the salaries provided in chapter 87, and when the duties required of the officers by the act are considered, we are forced to the conclusion that chapter 258 is nothing more nor less than an attempt to evade the constitutional provisions hereinbefore set out, in that the act did in fact purport to increase the salaries of county officers during the terms of office for which they were elected.

It may be said to the credit of the legislature that it no doubt recognized the inadequacy of the present salaries of county officers, and we are entirely in accord with the view that such salaries have been and are inadequate; but, be

that as it may, we are firmly of the belief that if a violation of these constitutional provisions is permitted or sanctioned on the ground of expediency, either by direct or indirect methods, such constitutional provisions might as well be written out of our organic law.

It may be conceded that we have stated in former decisions that the question of whether or not new duties, which a public officer is required to perform under the provisions of an act passed subsequent to his election, are extrinsic and foreign to the duties which he was required to perform under the law as it existed at the time of his election, may be considered in determining whether or not such officer is entitled to an increase in his salary during the term for which he was elected for performing such additional duties. But we are clearly of the opinion that it should not be the rule, and that it was not the intention of this court in any of its former decisions to say, that for performing additional duties provided by an act passed subsequent to his election, a public officer is entitled to additional salary or compensation during the term for which he was elected, even though such additional duties be extrinsic and foreign to the duties required of him at the time of his election, where it clearly appears, as in the instant case, that such act was passed with an intent to evade the constitutional provision prohibiting an increase in the salary of a county officer or the compensation of a public officer during the term for which he was elected.

Again we say that if the salary-fixing body can do indirectly what it has attempted to do by chapter 258, namely, increase the salary of county officers during the terms for which they were elected, then in our opinion § 25, Art. II, and § 8, Art. XI, would become nullities.

While we do not purport to say that the following cases are all the cases decided by this court involving some phase of the general question now before us, and do not pretend to say that in any of the cases referred to an exact factual situation such as we have before us in the instant case is presented, we repeat that these decisions plainly indicate the attitude of this court in regard to either a direct or an

evasive attempt to violate the plain provisions of the constitution. *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428; *Spokane County v. Allen,* 9 Wash. 229, 37 Pac. 428, 43 Am. St. 830; *Cox v. Holmes,* 14 Wash. 255, 44 Pac. 262; *Young v. Millett,* 19 Wash. 486, 53 Pac. 823; *State ex rel. Eshelman v. Cheetham,* 21 Wash. 437, 58 Pac. 771; *State ex rel. Davis v. Clausen,* 47 Wash. 372, 91 Pac. 1089; *State ex rel. Funke v. Board of County Commissioners,* 48 Wash. 461, 93 Pac. 920; *State ex rel. Wolfe v. Parmenter,* 50 Wash. 164, 96 Pac. 1047, 19 L. R. A. (N. S.) 707; *State ex rel. Maltbie v. Will,* 54 Wash. 453, 103 Pac. 479, 104 Pac. 797; *State ex rel. Port of Seattle v. Wardall,* 107 Wash. 606, 183 Pac. 67; *State ex rel. Younger v. Clausen,* 111 Wash. 241, 190 Pac. 324; *State ex rel. Hovey v. Clausen,* 117 Wash. 475, 201 Pac. 770; *King County v. Stringer,* 130 Wash. 287, 227 Pac. 17; *State ex rel. Cornell v. Smith,* 149 Wash. 173, 270 Pac. 306; *State ex rel. Cornell v. Smith,* 155 Wash. 422, 284 Pac. 796; *State ex rel. Jaspers v. West,* 13 Wn. (2d) 514, 125 P. (2d) 694; *State ex rel. Wyrick v. Ritzville,* 16 Wn. (2d) 36, 132 P. (2d) 737, 144 A. L. R. 681.

In none of the above cases, except *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428, did this court permit an increase in the salary or compensation of the public officer or officers involved, and we are of the opinion the *Carson* case is plainly distinguishable from the other cited cases and from the instant case. We referred to the *Carson* case in *Spokane County v. Allen,* 9 Wash. 229, 37 Pac. 428, 43 Am. St. 830, stating:

"We do not think that the doctrine enunciated in that case [*Carson* case] should in any event be extended, though it is plainly distinguishable from the case at bar. In that case the court held that a legislative act which provided that the county treasurer should be charged with the duty of assessing and collecting city taxes, *and that the city should pay him therefor* the sum of $500 per year, did not violate the constitutional inhibition against increasing the compensation of any public officer during his term of office." (Italics ours.)

It appeals to us that the *Carson* case might be sustained upon the theory that the statute under which the county

treasurer was required to collect city taxes, *for which service he was to be paid by the city*, did not offend against the spirit of the constitutional provisions at least. In other words, so long as neither the statutes nor the constitution prohibits a county officer from performing for some third person, body, or corporation services not directly connected with the duties of his office, the constitutional provisions are not violated, where such public officer performs such duties and is paid therefor by the person, body, or corporation for whom the services are performed. We think it was upon this theory that the *Carson* case was decided.

The *Carson* case is the only one from this state cited by respondents to sustain their contention on this phase of the present controversy. Respondents have cited numerous cases from other jurisdictions, among them *Groesbeck v. Fuller*, 216 Mich. 243, 184 N. W. 870, 21 A. L. R. 249.

■ Without attempting to discuss the constitutional provisions in the several states in which the decisions in the cases last above referred to were rendered, or the factual situations presented, we are of the opinion that those cases are not controlling in this case, first, because in the interpretation and application of the constitutional provisions of this state, this court is not bound by the decisions of the courts of sister states in the interpretation and application of their constitutional provisions, and second, when the facts in the instant case are considered, we believe the conclusions we have reached in the instant case are not out of harmony with the decisions in the cited cases.

We conclude that the intent of the legislature in passing chapter 258 was to increase the salaries of county officers during the term for which they were elected, from the effective date of the act to January 1, 1947, and that the act, if declared valid, would in fact so increase such salaries, contrary to the prohibition contained in § 25, Art. II, and § 8, Art. XI, of the state constitution.

For the reason assigned, the judgment of the trial court is reversed, with instructions to enter judgment dismissing this action.

MILLARD, STEINERT, BLAKE, and ROBINSON, JJ., concur.

MILLARD, J. (concurring)—I concur in the holding that for performing additional duties provided by an act passed subsequent to his election, a public officer may not be paid additional salary or compensation during the term for which he was elected, even if such additional duties are extrinsic and foreign to the duties required of him at the time of his election, which is the sole question answered by the majority opinion.  To hold otherwise would nullify the plain, unambiguous language of the constitution which forbids the increase in the case at bar.  Anything that we have said which tends to nullify the constitutional prohibition against increasing or diminishing the compensation of any public officer during his term of office should be overruled.

One will take an oath to support the constitution, and then readily, and even eagerly, breach that oath if he thinks it politically expedient for him to do so.  Like Herod, who, for a good and sufficient political reason closely affecting the permanence of his reign in Judea, set aside the law and committed wholesale murder in his endeavor to effect the physical death of the Son of God.  History proves that merely taking the oath of office does not change human nature and cannot make honest men out of born knaves.

Faith plighted is ever to be kept, was a maxim and an axiom even among pagans.  The virtuous Roman said that either let not that which seems expedient be base, or if it be base, let it not seem expedient.  What is there which that so-called expediency can bring, so valuable as that which it takes away, if it robs you of your integrity and honor?  Throughout the ages, he who violates his oath has been held unspeakably base.

Legislative recreancy may not be absolved by judicial cowardice and intellectual jugglery.  We may not, unless false to our oath, look with an indifferent eye upon the legislature's attempt to breach the constitution.

It is true, as observed in one of the dissenting opinions, that presumption of constitutionality is one of the aids employed in interpretation and construction of statutes.  The author of that dissenting opinion should have listed another aid no less frequently invoked:  The faculty to sense the

voting strength for or against constitutionality of a legislative enactment. The characteristic—"double talk"—of the Japanese nation is too often utilized by judges in their attempt to excuse evasion of an unambiguous constitutional mandate which is so plain that a grammar school pupil would be classified as subnormal did he misunderstand its meaning.

The constitutional mandate is simple, intelligible. To agree with the minority view is to wander from the true theory by reason of want of the logical faculty or transgress against the constitutional mandate on the plea of necessity or expediency. In either case, did I so act I would deem I had offended against first principles and had been false to my oath to support the constitution.

That portion of the act creating the county statistics commission, I do not challenge as unconstitutional. That portion of the act increasing the compensation of the county officials is invalid as it offends against the state constitution.

The opinion in *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428, should be overruled. The legislative enactment challenged in that case is clearly unconstitutional, as it permitted the legislature, which may not impose taxes upon any municipal corporation for municipal purposes, to indirectly do the thing forbidden by the constitution; it was a flagrant by-passing of the constitution.

The evil that men do lives after them. For little more than a decade it has been the vogue to contemn the Federal and state constitutions. That practice should be discontinued.

SIMPSON, J. (dissenting)—It is elementary that a statute must be sustained and enforced unless it is in clear and irreconcilable conflict with some express provision of the constitution. On the other hand, if the constitutional provision and the legislative enactment are so clearly in conflict that they cannot both stand, the statutory provision must of course fail.

In construing a statute, every reasonable intendment will be indulged in, in favor of the construction that is in con-

formity with the provision of the constitution. If a reasonable doubt appears, it should be resolved in favor of the validity of the law.

A statute when enacted possesses that binding force and effect named therein unless it is clearly in conflict with our fundamental law. In other words, a statute cannot be judicially declared beyond the power of the legislature to enact, unless in conflict with some specific or definite provisions of the constitution. *State v. Emonds,* 107 Wash. 688, 182 Pac. 584.

The legislature may enact any law not expressly or inferentially prohibited by the constitution, the constitution being a limitation and not a grant of power. *Walker v. Spokane,* 62 Wash. 312, 113 Pac. 775; *State ex rel. Mountain Timber Co. v. Superior Court,* 77 Wash. 585, 137 Pac. 994; *Standard Oil Co. v. Graves,* 94 Wash. 291, 162 Pac. 558; *Sears v. Western Thrift Stores,* 10 Wn. (2d) 372, 116 P. (2d) 756.

The question presented here is: Does the act represent a valid exercise of the legislative power? If it does, this court cannot hold it to be invalid merely because it may be an unwise law and of questionable expediency, or because it may be unable to correct the supposed evils that it is intended to remedy, or because of any other objection directed to its wisdom.

It seems to me that the proper approach to a consideration of the act would be to consider it without reference to who should be paid for the services to be performed under the act. That is: Would the act be unconstitutional if it provided that the services should be performed by a board in each county composed of private citizens appointed by the governor?

Considering it in the light just mentioned, it seems that no valid objection could be made to the act. True, as pointed out by the majority, the statute does not provide for any use of the information to be secured by the commission. The act simply provides for a census of individuals who have served in the present war, the purpose of which is not material in so far as the courts are concerned.

The legislature has the undoubted power to pass any act regardless of the object to be obtained. The fact that certain county officers shall be paid for the work required by the act under consideration, is not material but is only incidental.

The fact that the act does not provide for any use of the statistics to be secured by the commission, is not material. It is not necessary to the validity of the act that the legislature determine what shall be done with the results of the work of the commission. The truth of this statement is obvious when we recall that most of our laws defining the general duties of state and county officials do not point out or determine the use to be made of the achievements of those officers. The constitution does not require any definite requirement of legislative acts.

As a matter of fact, the records compiled by the county statistics commission could be used by the supervisor of the veterans' loan insurance created by chapter 217, p. 614, Laws of 1945, and by the various organizations having to do with veterans' relief as provided for by chapter 144, p. 416, Laws of 1945.

The case of *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428, has a direct bearing upon the issue in the case at bar. In that case, it was held that a law passed during the term of a county treasurer, which imposed upon him the duty of collecting city taxes and allowing him a salary of five hundred dollars a year in addition to that which he was receiving from the county, was not subject to the constitutional prohibition that the salary of a public officer could not be increased during his term of office. The reason for so holding was that the collection of city taxes was entirely outside his duties as county treasurer.

A discussion of the principle involved in this case is found in *State ex rel. Younger v. Clausen,* 111 Wash. 241, 190 Pac. 324, and in *State ex rel. Bagley v. Clausen,* 111 Wash. 254, 190 Pac. 329. The holding in these cases is that additional salaries may be made to an elected officer if the new duties imposed upon him are outside or extrinsic to his duties imposed under a prior law; but, on the other hand,

if the newly imposed duties are collateral, incidental, or germane to his existing duties, no additional salary may be allowed.

It is quite apparent that the duties imposed upon the county officers by the act under consideration are entirely outside and foreign to the duties required by the general laws relating to county officers.

The leading case upon the question presented is that of *Groesbeck v. Auditor General*, 216 Mich. 243, 184 N. W. 870, 21 A. L. R. 249. The 1921 legislature of Michigan passed an act which provided for an administrative board consisting of the governor, secretary of state, state treasurer, auditor general, attorney general, state highway commissioner, and the superintendent of public instruction. The duties of the board were set out in the opinion as follows:

"The duties imposed upon said board are the exercise of general supervisory control over the functions and activities of all administrative departments, boards, commissions and officers of the State and all the State institutions. In addition thereto said board performs all the duties heretofore vested by law in the State budget commission, the State purchasing agent and the advisory board in the matter of State purchasing. Said board also exercises control over the system of State accounting and the manner of handling such work. The aforesaid confers upon said board direct and complete supervision over the State budget, all State purchasing, State accounting, the State accident fund, department of agriculture, expenditure of State appropriations, State building activities, all matters of State finance including bond issues and expenditure of the emergency fund, and the regulation of the sale of steamship tickets and foreign exchange. It also confers upon said board supervision and primary control over the department of public safety, department of conservation, State highway department, department of labor and industry and the State welfare department."

The act also provided that the treasurer, secretary of state, and auditor general should receive in payment of their duties as members of the board an additional compensation of twenty-five hundred dollars per year.

The Michigan constitution is similar to ours in that it fixes the salaries of certain of the state officers who made up the board to which I have just referred. That constitution also provides that the salaries of those officers shall not be increased during their term.

The supreme court of the state of Michigan held that the law was constitutional and based its conclusions upon the same principles announced by us in *State ex rel. Younger v. Clausen, supra.* Accord: *State v. Roddle,* 12 S. D. 433, 81 N. W. 980; *James v. Cammack,* 139 Ky. 223, 129 S. W. 582; *Coleman v. Hurst,* 226 Ky. 501, 11 S. W. (2d) 133; *Tayloe v. Davis,* 212 Ala. 282, 102 So. 433, 40 A. L. R. 1052. See cases cited in 21 A. L. R. 256 and 51 A. L. R. 152.

The act under consideration was the product of the legislature acting under authority of our constitution to provide laws for the government of the people of this state. In their wisdom, the legislature saw fit to provide a county statistics commission and to define its duties. The duties imposed upon the officials comprising the commission were foreign to those imposed by law upon the respective officers at the time of the passage of the act of 1945.

It appears to me that we should be governed in this case by the rule announced in *State ex rel. Seattle v. Carson, supra.* The judgment of the trial court should be affirmed.

GRADY, J. (dissenting)—I concur in all that Judge Simpson has said in his dissenting opinion. It seems to me also that, while the majority recognize the rules, so often stated, to the effect that courts will presume that an act regularly passed by the legislature, is a valid law, and will not inquire into what may have been its motive or the purpose or intention of those who enacted it, but will determine the question of its constitutionality only from what appears on the face of the act, or aided, if necessary, by facts or matters of which the court may take judicial notice, the conclusion reached in the majority opinion is not justified when those rules are applied to the act before us. Such rules are founded upon the theory that the enactment of a statute being a prerogative of the other two co-ordinate

branches of the government, the legislative and the executive, the judicial branch must presume that each department must have been mindful of its obligations and its duties and actuated by proper and lawful motives, purposes, and intention in the enactment and approval of legislation, and not reach a conclusion that either department has acted otherwise, unless it is compelled to do so from what appears on the face of the enactment itself, aided as heretofore stated.

In view of the respective positions occupied by the three departments in our scheme of government, much has been said as to the proper attitude to be taken by the courts when the motive and intent of the other departments are questioned. One of the most clear and lucid expressions I have found is what was said by the United States supreme court in *McCray v. United States*, 195 U. S. 27, 53, 49 L. Ed. 78, 24 S. Ct. 769, 1 Am. & Eng. Ann. Cas. 561:

"Whilst, as a result of our written constitution, it is axiomatic that the judicial department of the government is charged with the solemn duty of enforcing the Constitution, and therefore in cases properly presented, of determining whether a given manifestation of authority has exceeded the power conferred by that instrument, no instance is afforded from the foundation of the government where an act, which was within a power conferred, was declared to be repugnant to the Constitution, because it appeared to the judicial mind that the particular exertion of constitutional power was either unwise or unjust. To announce such a principle would amount to declaring that in our constitutional system the judiciary was not only charged with the duty of upholding the Constitution but also with the responsibility of correcting every possible abuse arising from the exercise by the other departments of their conceded authority. So to hold would be to overthrow the entire distinction between the legislative, judicial and executive departments of the government, upon which our system is founded, and would be a mere act of judicial usurpation.

"It is, however, argued if a lawful power may be exerted for an unlawful purpose, and thus by abusing the power it may be made to accomplish a result not intended by the Constitution, all limitations of power must disappear, and

the grave function lodged in the judiciary, to confine all the departments within the authority conferred by the Constitution, will be of no avail. This, when reduced to its last analysis, comes to this, that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department.

"The proposition, if sustained, would destroy all distinction between the powers of the respective departments of the government, would put an end to that confidence and respect for each other which it was the purpose of the Constitution to uphold, and would thus be full of danger to the permanence of our institutions. As aptly said by the court, speaking through Mr. Justice Miller, in *Kilbourn v. Thompson*, 103 U. S. 168, P. 190:

" 'It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to the government, whether State or National, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.'

"It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions,

reliance must be placed for the correction of abuses committed in the exercise of a lawful power. This was aptly pointed out in *Champion v. Ames,* 188 U. S. 321, where, speaking through Mr. Justice Harlan, it was said (p. 363):

" 'But if what Congress does is within the limits of its power, and is simply unwise or injurious, the remedy is that suggested by Chief Justice Marshall in *Gibbons v. Ogden,* when he said: "The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments." '

"The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted. As we have previously said, from the beginning no case can be found announcing such a doctrine, and on the contrary the doctrine of a number of cases is inconsistent with its existence."

In 1 Cooley's Constitutional Limitations (8th ed.) 379, the author states the following:

*"Inquiry into Legislative Motives.* From what examination has been given to this subject, it appears that whether a statute is constitutional or not is always a question of power; that is, a question whether the legislature in the particular case, in respect to the subject-matter of the act, the manner in which its object is to be accomplished, and the mode of enacting it, has kept within the constitutional limits and observed the constitutional conditions. In any case in which this question is answered in the affirmative, the courts are not at liberty to inquire into the proper exercise of the power. They must assume that legislative discretion has been properly exercised. If evidence was required, it must be supposed that it was before the legislature when the act was passed; and if any special finding was required to warrant the passage of the particular act, it would seem that the passage of the act itself might be held equivalent to such finding. And although it has sometimes been urged at the bar that the courts ought to inquire into the motives of the legislature where fraud and corruption

were alleged, and annul their action if the allegation were established the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon. The reasons are the same here as those which preclude an inquiry into the motives of the governor in the exercise of a discretion vested in him exclusively. He is responsible for his acts in such a case, not to the courts, but to the people."

In *State ex rel. Govan v. Clausen,* 108 Wash. 133, 137, 183 Pac. 115, we said:

"Exactly what is sought by respondent is to have the court, as triers of facts, impeach the judgment of another and co-ordinate branch of the government, as triers of facts. In declining to do so, we rely not alone upon a consideration of the well-recognized delicacy of judicial interference with legislative powers, but also upon the cold and manifest reason that, by the clearly-defined and respected form of co-ordinate departments of our government, we have no power to do so. Courts may declare legislative enactments invalid in some cases, but not because judicial power is superior in degree or dignity to the legislative; and it will be found, according to the general rule, that such declarations are the results of consideration of the enactments as they appear upon their faces, or influenced by facts within common knowledge and of which courts take judicial notice. *State v. Sommerville,* 67 Wash. 638, 122 Pac. 324; *Stevenson v. Colgan,* 91 Cal. 649, 27 Pac. 1089. The act in question is fair upon its face."

That case has a distinguishing feature from the one before us, in that the court was asked to inquire into allegations of fraud set out in the answer; but what was said, with reference to the approach the court must make to the action of the legislature when it is attacked, is applicable to the instant case.

We have before us an act which has as its objective the gathering and recording of certain data relative to those who are, or have been, in service in the armed forces of the United States, which the lawmakers have considered necessary to obtain in order to aid in carrying out plans for their rehabilitation and reconversion when they return to civilian life. It does not seem to be questioned that the

legislature had the power to so provide. A commission is created in each county of the state, and it is directed to gather and record such data. This, likewise, is an exercise of lawful power. The personnel of the commission is composed of elective officers of the county. I do not gather from the majority opinion that such officers are not eligible to serve on the commission. The act provides for, and fixes, the amount of compensation each commissioner shall be paid for the services to be rendered. The law is well established that, in addition to creating public offices and fixing and defining the duties of the officers, the legislature may provide they shall be paid for their services in performing such duties and the amount thereof. The duties the members of the commission are to perform are entirely different from, and bear no relation to, those performed by any of the county elective officers. The duties prescribed are not additional duties required of any of the county officers beyond those they perform in their official capacities. A new office is created, and new duties prescribed. There is no law against one person holding two public offices if they are not incompatible. It is no concern of the court whether the getting and recording of the data are necessary or desirable, or whether it will involve much or little work on the part of the commissioners, or whether it will ever be used. These and other similar considerations are legislative and not judicial.

It may be that, taking the whole setup by its four corners, there can be said to be a reasonable ground of suspicion that the objective was to assist elective county officers in a financial way until the act increasing their salaries could become operative. But this does not warrant the court in saying such is the fact and was the motive and intent of the legislature and the executive. If we do so, we must put ourselves in the position of drawing an inference and arriving at a conclusion therefrom without any factual basis, so far as the face of the act discloses, and there are no facts or matters of which we may take judicial notice to support any inference.

It seems to me that we must accept the act at its face value and not impute to the other departments of government a motive or intent to evade the inhibitions of the constitution. My concern is that, if we do otherwise, we impliedly extend an invitation to those who may feel, in a given case, the motives and intent of the legislature were contrary to what its action on the face of a statute discloses, to ask us to declare such statute unconstitutional by the use of a process of reasoning and deduction, and, if we should follow such a course, it would be a distinct departure from that contemplated by our governmental plan.

A new office having been created and new and different duties prescribed from those performed by the respective county officers, the inhibitions of the constitution relating to increase of salaries or compensation do not apply. 43 Am. Jur. 153, Public Officers, § 366. This is a rule in regard to which I find no dissent, and is the same as is pronounced in those cases where additional duties were required of a public officer after his election to an office not incidental or germane to those of his office, and compensation was provided therefor.

In addition to the cases cited by Judge Simpson, I refer to: *Moore v. Moore,* 147 Va. 460, 137 S. E. 488, 51 A. L. R. 1517; *Springer v. Board of Education,* 117 W. Va. 413, 185 S. E. 692; 46 C. J. 1017, Officers, § 242; 43 Am. Jur. 151, Public Officers, § 364.

The case of *Coleman v. Hurst,* 226 Ky. 501, 11 S. W. (2d) 133, is of special interest. A statute was enacted creating a judicial council and making circuit judges members thereof, and provided compensation for the performance of their duties as such members. The court held that the duties prescribed by the act were wholly outside those of a circuit judge, and that the constitutional provision against increase of salary or compensation of a public officer during the term for which he was elected was not violated. The statute was not considered objectionable because those already holding a public office were made members of the council. The court declined to adopt the view that the pur-

pose of the act was merely to increase the salaries of the circuit judges.

Viewing the case from any of the angles discussed, I think the judgment should be affirmed.

MALLERY, J., concurs with GRADY, J.

BEALS, C. J., concurs with SIMPSON and GRADY, JJ.

October 5, 1945.   Petitions for rehearing denied.