COUGHLIN, J.
 

 This is an appeal from a judgment granting peremptory writ of mandate ordering Robert N. Klein and the city of Fresno (appellants herein) to restore E. Boris Stahm (respondent herein) to the position of planning director for the city of Fresno.
 

 The city of Fresno was originally incorporated under the general laws. It reorganized its government under a freeholder charter approved by the Legislature and filed January 28, 1901, pursuant to section 8 of article XI of our state Constitution, and having a board of trustees charged with legislative duties and a mayor as chief executive supervising substantially all of its executive functions. A second reorganization took place under a new constitutional charter approved by the Legislature and filed January 21, 1921, under which a so-called commission form of government was
 
 *514
 
 adopted, having five commissioners, the executive functions of government being largely divided between three of said commissioners, i.e., the mayor (commissioner of public safety and welfare), the commissioner of finance, and a commissioner of public works. By this charter the city commission was authorized to create a planning board. This was done and a planning department under a director of planning was created and placed under the general supervision of the commissioner of public works. This department had charge of the problems of planning orderly and efficient arrangement of public services involved in the future growth of the city, both internally and externally. It likewise had charge of zoning, variances, building permits and zoning inspections, to insure adequate compliance with the city ordinances designed to protect the health and general welfare of the people of the city. November 16, 1949, Stahm took.office as director of planning and held that position continuously thereafter until November 2, 1958. Later an assistant planning director was provided and George Kerber was appointed thereto. By ordinance both positions were included in classified civil service.
 

 April 8, 1957, the voters of the city of Fresno provided for a third reorganization of their government by adopting a new constitutional charter, which was approved by the Legislature and filed June 10, 1957. This new charter adopted the so-called city manager-council form of government, with the legislative functions primarily under a council and most of the executive functions under a chief administrative officer appointed by and responsible solely to the council. By this charter the chief administrative officer, in addition to being charged with supervision of nearly all of the officers and employees exercising executive functions for the city, is also given the right to make all appointments, suspensions and removals, and to assume the authority of any department head, subject generally to council approval, city charter restrictions and to civil service ordinances. He is further authorized to advise the council concerning the organization, conduct, operation and alteration of the various departments, officers and agents of the city government. The council, as the legislative body of the city, has, of course, the duty and power to provide by ordinance for the various officers and employees deemed by it to be necessary for the city, and to provide for the compensation of such officers and employees. It may also, by either ordinance or resolution, assign addi
 
 *515
 
 tional duties to any office, department or agency not inconsistent with the charter.
 

 The charter provides for a civil service system under a Civil Service Board, giving such board the duty to recommend to the council respecting civil service rules, advise the council respecting personnel problems, hear grievances of employees relating to suspension, demotion or dismissal, advise the council thereon, and make investigations concerning employment conditions and personnel administration, reporting the results to the council. The unclassified services of the city (not protected by civil service regulations) include all elective officers, the chief administrative officer and his deputies, city clerk, city attorney and deputies, controller, heads of department of public works, utilities, personnel, park and recreation, civil defense, boards and commissions, part-time employees paid on an hourly per diem basis, and certain others in special part-time or professional service. Classified service officers and employees include all others, and they are protected from removal without cause in accordance with the civil service rule requiring that an employee or officer suspended, demoted or removed for cause be given written reasons therefor, time to answer the same, the right to public hearing before the civil service board, a report thereon to and final decision in the city council. All ordinances, including the civil service ordinances, of the city of Fresno are continued in effect until changed by proper authority.
 

 The first real step in the new reorganization came with the appointment August 1, 1958, of Klein as Chief Administrative Officer. August 28, 1958, Klein submitted to the council a document calling attention to city needs and planning, loss by certain sections of the people of confidence in the leadership in the planning department, and recommending the creation of a new department of planning and inspection; the abolishment of the then existing position of planning director (held by Stahm) and zoning administrator; elimination of certain part-time budget money; authority for employment of a planning consultant to install a new department and transfer all personnel of the old department to a new department of planning and inspection. On the same day the council approved this recommendation and directed the city attorney to submit an opinion regarding the position of the new department head under civil service. Stahm was then told that his position would be abolished as of November 2, that his pay would continue to that date, and he was forthwith
 
 *516
 
 relieved from further active duty. September 11,1958, Stahm filed with the civil service board a written demand for a public hearing on the subject of his ouster; September 19, 1958, the civil service board denied such hearing on the ground that it lacked jurisdiction. September 25, 1958, Stahm filed with the city council a similar demand for a hearing, which the council denied October 2, 1958. October 2, 1958, the council enacted Ordinance 5442 and Ordinance 5443 (effective November 2, 1958, and November 1,1958, respectively). By these two ordinances numerous changes were made in city department organizations and many positions were abolished and duties transferred. Among the positions abolished was that of planning director. The name of assistant planning director was changed to assistant planning supervisor, and the name of senior building inspector was changed to assistant building supervisor, with additional qualifications. November 5, 1958, the civil service board rejected a request of Stahm for an investigation.
 

 In the meantime, pursuant to authorization of the council, on August 28, 1958, Ebaseo Services, planning consultants of New York, had been employed, and they had been in consultation with Klein respecting the progressive organizational changes taking place. However, their formal report was not rendered until November 7, 1958. December 4, 1958, the council adopted further changes in the planning and other departments with the ultimate result that the former planning department and the inspection department were divided into three separate entities: (1) a planning division under an assistant planning supervisor whose sole duties are advance planning, project planning and research; (2) an administration division under an administrative supervisor responsible for plan checking, permit processing, zoning administration and stenographic and clerical work; and (3) a division was formed including all the former inspection personnel except the clerical and stenographic who went to the administrative division. This inspection division was placed under an assistant building supervisor, responsible for electrical, plumbing and building inspection. All three of these divisions were placed under a planning and inspection department with a deputy chief administrative officer (planning and inspection services) in charge. This position is held by a new appointee named Behrens.
 

 Following August 28, 1958, the technical responsibility for direction of the planning and zoning work devolved on the
 
 *517
 
 shoulders of Klein. However, Kerber, Assistant Planning Director, temporarily, until November 2, 1958, to all intents and purposes, took over the actual work of Stahm but continued to perform his own work. A part of the distribution of the work that had formerly rested on the shoulders of Stahm took place November 2, 1958, when Ordinance 5442 took effect. Further distribution took place after the filing of the final Ebaseo report November 7, 1958, but no new person was hired to do the work of Kerber, whose work in the total picture of planning and inspection services, except for the temporary period between August 28, 1958, and November 2, 1958, remained at about the same level as it always had been. The right to final approval of zoning variance and zoning changes, formerly exercised by Stahm, went to a zoning board. Testimony that Kerber’s raise in pay was a part of a general raise in all departments stands uncontradicted in the evidence. Even this general pay raise, in which Kerber participated, left him far short of the salary formerly paid to Stahm. Thus, there is no evidence whatever that he received a pay raise inconsistent with the work he was doing prior to the abolition of Stahm’s job. A careful analysis of all the evidence shows indisputably that it will not support any other conclusion than that while Kerber, following August 28, 1958, and up to November 2, 1958, continued to perform the work of both the planning director and the assistant planning director, he nevertheless remained at a subordinate level and on and after November 2, 1958, most of the executive prerogatives formerly exercised by Stahm went to boards or to Behrens, Deputy Chief Administrative Officer.
 

 The testimony reveals that the over-the-counter contacts with the public on zoning adjustments, variances, and permits of various kinds, which contacts had previously taken up a great deal of the time of the members of the old planning department, all went into the administrative division along with the stenographic and clerical staff, thus taking that responsibility from the planning division. There therefore appears to be nothing at all unreasonable in the decision of the council that the planning division did not any longer need both a planning director and an assistant planning director. In this proceeding Stahm has never contended that the duties of the deputy chief administrative officer (planning and inspection services), now occupied by Behrens, are the same as those performed by Stahm in the old department, and the trial court found as a fact that the position now occupied by Beh
 
 *518
 
 rens is substantially different from that formerly occupied by Stahm. However, it is clear that those executive prerogatives of Stahm which placed Stahm in a higher echelon than ICerber, did, for the most part, go to Behrens as Deputy Chief Administrative Officer or to boards.
 

 The first question which this court must decide is whether or not bad faith, which invalidates a legislative act, may be shown in any other way than by the ordinance itself and the results which it accomplishes. In other words, can evidence of oral conversations relating to ill feeling among the members of the official family or the general public, be received in evidence to prove the presence in the minds of the council members of good or bad thoughts and thereby a charge of bad faith.
 

 We think this question must be answered in the negative. In reality, no action taken by mortal man can ever be said to have been done from a single unadulterated motive. The mind of man contains such a complex combination of thoughts and emotions that clearly segregating them is a virtual impossibility. Courts are compelled to recognize and understand this factor in human thinking and action in all phases of their work of weighing evidence and considering decisions. About all that a court can hope for, even in those cases in which it is permitted to consider motive, is to attempt to ferret out the principal or dominating purpose of the party. Even this is fraught with innumerable difficulties. The people of this country, from the first breath of its existence to the present time, have continuously sought to keep separate and apart the judicial and legislative functions. Any attempt, therefore, by the judiciary to define the personal thoughts of the legislator in voting for the passage of a law involves such delicate and frustrating problems that it has always been frowned upon. It is only when the law on its face or in its results shows an improper purpose, motive or intent, and thereby unfairly and improperly damages a person, that the courts may interfere. The terms bad faith or improper motive to invalidate a legislative act are ordinarily used only in that sense.
 

 In
 
 Soon Hing
 
 v.
 
 Crowley,
 
 113 U.S. 703 [5 S.Ct. 730, 28 L.Ed. 1145], which may well be called the leading case on the subject in the United States because of the innumerable times that it has been cited with approval by both state and federal courts, the court said:
 

 “And the rule is general, with reference to the enactments
 
 *519
 
 of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with respect to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows from the natural and reasonable effect of their enactments. Their motives, considered as moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile.”
 

 In
 
 Werner
 
 v.
 
 Southern California etc. Newspapers,
 
 35 Cal.2d 121, 128 [7] [216 P.2d 825, 13 A.L.R.2d 252], our own state Supreme Court said: “It is for the Legislature, however, to choose between conflicting policies, and this court may not presume that in reaching its decision it acted upon improper motives. . . . a judiciary must judge by results, not by the varied factors which may have determined legislators’ votes. We cannot undertake a search for motive in testing constitutionality. ’ ”
 

 In
 
 Livingstone
 
 v.
 
 MacGillivray,
 
 1 Cal.2d 546, 558 [5] [36 P.2d 622], the court said: “Furthermore, even if bad faith had been pleaded, proof of extraneous facts for the purpose of showing motive was not allowable in the absence of some showing on the face of the resolution of abolition that it was adopted from improper motives.”
 

 In
 
 Monahan
 
 v.
 
 Department of Water & Power,
 
 48 Cal.App.2d 746, 754 [10] [120 P.2d 730], it is said: “The allegation that troublemen were appointed because of 'whim, caprice and favoritism’ is nothing but an allegation of motive; and as the standards of the law are external, motives are not actionable. Where there is a legal right to do a certain act, the motive which induces the exercise of the right is of no importance. ’ ’
 

 This rule has been summed up in Cooley’s Constitutional Limitations, seventh edition, 258: “And although it has sometimes been urged at the bar that the courts ought to inquire into the motives of the legislature where fraud and corruption are alleged, and annul their action if the allegation were established, the argument has in no case been acceded to by the judiciary, and 'they have never allowed the inquiry to be entered upon.”
 

 In American Jurisprudence, volume 11, pages 818 to 820,
 
 *520
 
 the rule is summed up as follows: ‘‘The rule as to the inapplicability of legislative motive or interest to invalidate enactments is subject to the established exception that such matters may be gone into by the courts to the extent that they may be disclosed on the face of acts or may be inferable from their operation. Both the rules and the exception are examples of the general doctrine heretofore discussed that since the purpose of a statute should be determined from the natural and legal effect of the language employed, whether it is repugnant to the Constitution must therefore be determined from its natural effect when put into operation, and not from its proclaimed purpose.
 

 “The general prohibition against inquiry as to the motives of the legislators applies to acts of Congress, to laws enacted by the state legislatures, and to ordinances and bylaws passed by municipal corporations.”
 

 The rule is similarly summed up in many other authorities. A few of these are: McQuillin, Municipal Corporations, third edition, section 16.90;
 
 Odd Fellows Cemetery Assn.
 
 v.
 
 San Francisco,
 
 140 Cal. 226, 235-236 [73 P. 987];
 
 Dobbins
 
 v.
 
 City of Los Angeles,
 
 139 Cal. 179, 184 [72 P. 970, 96 Am.St.Rep. 95];
 
 People’s Petroleum Producers
 
 v.
 
 Sterling,
 
 60 F.2d 1041, 1045;
 
 State
 
 ex rel.
 
 Troy
 
 v.
 
 Yelle,
 
 27 Wn.2d 99 [176 P.2d 459, 170 A.L.R. 1425]; and
 
 Daniel
 
 v.
 
 Family Security Life Ins. Co.,
 
 336 U.S. 220 [69 S.Ct. 550, 93 L.Ed. 632, 10 A.L.R. 2d 945],
 

 We conclude that extraneous evidence to prove bad faith of the council in enacting Ordinance 5442 was improper and could serve only to cloud and confuse the issue. It should not have been received.
 

 The next question is whether or not the council, in abolishing the position of planning director and transferring the duties to others (found by the court in this instance to have been principally transferred to the then position of assistant planning director, whose title was later changed to assistant planning supervisor), shows on its face or by its results bad faith, which would invalidate the ordinance. Again, we think the answer must be in the negative.
 

 This situation is no different from that in which the total number of police officers in a division of a police department is thirty-three, headed by a captain and a lieutenant. The city council becomes convinced that a captain is unnecessary, abolishes the job of captain and consolidates all of the duties of the captain and the lieutenant in the position of lieutenant;
 
 *521
 
 or vice versa, abolishes the job of lieutenant and consolidates all the duties of the captain and the lieutenant in the position of captain. In either event, the positions in the division have been reduced from 33 to 32, which the legislative body unquestionably had the right to do for the purposes of reorganization. One of the two men must go. The right to decide that question rests in the legislative body unless there is some provision in the charter or civil service laws which gives one a legal preference over the other. No such limitations in the charter or ordinances of the city of Fresno have been pointed out to us, and a careful perusal of the record before us has revealed none. We therefore have no such circumstances as were present in the ease of
 
 Stockton
 
 v.
 
 Department of Employment,
 
 25 Cal.2d 264 [153 P.2d 741], where the broader protection of state civil service laws gave a person with seniority rating the right to “bump” a junior in service if the former’s position were abolished.
 

 The right of a legislative body, in the absence of restrictive charter provisions, to choose which of two positions to retain when one is abolished has been repeatedly upheld.
 
 (O’Neill
 
 v.
 
 Williams,
 
 53 Cal.App. 1 [199 P. 870];
 
 Foley
 
 v.
 
 City of Oakland,
 
 33 Cal.App. 128 [164 P. 419];
 
 State
 
 ex rel.
 
 Voris
 
 v.
 
 Seattle,
 
 74 Wash. 199 [133 P. 11, 4 A.L.R 198];
 
 Wipfler
 
 v.
 
 Klebes,
 
 284 N.Y. 248 [30 N.E.2d 581]; McQuillin, Municipal Corporations, 3d ed., § 12.118.)
 

 We see nothing in
 
 Rexstrew
 
 v.
 
 City of Huntington Park,
 
 20 Cal.2d 630 [128 P.2d 23], contrary to our views. There bad faith was shown by results. Nine police and firemen were discharged by resolution “for purposes of economy” when, in fact, there was plenty of money in the treasury. Two probationary employees were retained or rehired soon after, as well as several others of those discharged. It was not a case of general reorganization such as is present in the case at bar.
 

 Clearly this was not a case of the council picking on just one person or one group. The city of Fresno was unquestionably in the throes of a complete reorganization of all its services. We think the city council had the right to consolidate the duties of two positions into one position, and that such action does not show either on its face nor by its results any bad faith. No attempt has been made to point out to us any provision of the charter which gives to the head of a department the right to step into the shoes of and oust his assistant when the duties of the two positions are consolidated and
 
 *522
 
 the assistant's position is the only one retained in existence. Likewise, no provisions of the civil service ordinance giving such a right has been pointed out to us, and we have found none in the record before us.
 

 Our views on the foregoing matters make unnecessary the discussion of other points raised by appellants.
 

 The judgment is reversed.
 

 Griffin, P. J., and Shepard, J., concurred.
 

 A petition for a rehearing was denied May 2, 1960, and respondent’s petition for a hearing by the Supreme Court was denied June 2, 1960. Peters, J., was of the opinion that the petition should be granted.