[No. 30120. *En Banc.* January 10, 1947.]

THE STATE OF WASHINGTON, *on the Relation of Smith Troy et al., Plaintiff,* v. CLIFF YELLE, *as State Auditor, Respondent.*[1]

[1]Reported in 176 P. (2d) 459.

The Attorney General, S. Harold Shefelman, Special Assistant, and Smithmoore P. Myers, Assistant, for relators.

Tanner, Garvin & Ashley, for respondent.

Brodie & Brodie, amicus curiae.

SCHWELLENBACH, J.—This matter came before this court on an original application of relators, filed November 1, 1946, for an alternative write of mandate to require Cliff Yelle, as auditor of the state of Washington, to issue and deliver to each of the relators, in payment of their salaries as members of the Washington commission on interstate cooperation for the month of October, 1946, the necessary warrants, as prescribed by chapter 195, Laws of 1945, p. 565 (Rem. Supp. 1945, § 10964-50 et seq.), or to show cause why he had not done so. The respondent demurred to the application, and thereby placed in issue the constitutionality of chapter 195. Relator Smith Troy is the attorney general of the state of Washington, Pearl Wanamaker the superintendent of public instruction, Belle Reeves the secretary of state, Russell Fluent the state treasurer, and Victor A. Meyers the lieutenant governor. All are members of the commission.

We are immediately confronted with the following provisions of the constitution:

Art. II, § 25: "The legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor after the services shall have been rendered or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office."

Art. III, § 25: ". . . The compensation for state officers shall not be increased or diminished during the term for which they shall have been elected. The legislature may, in its discretion, abolish the offices of the lieutenant-governor, auditor and commissioner of public lands."

Art. III, § 16: "The lieutenant-governor shall be presiding officer of the state senate, and shall discharge such other duties as may be prescribed by law. He shall receive an annual salary of one thousand dollars, which may be increased by the legislature, but shall never exceed three thousand dollars per annum."

Art. III, § 17: "The secretary of state shall keep a record of the official acts of the legislature and the executive department of the state, and shall, when required, lay the same, and all matters relative thereto, before either branch of the legislature, and shall perform such other duties as shall be assigned him by law. He shall receive an annual salary of twenty-five hundred dollars, which may be increased by the legislature, but shall never exceed three thousand dollars per annum."

Art. III, § 19: "The treasurer shall perform such duties as shall be prescribed by law. He shall receive an annual salary of two thousand dollars, which may be increased by the legislature, but shall never exceed four thousand dollars per annum."

Art. III, § 20: "The auditor shall be auditor of public accounts, and shall have such powers and perform such duties in connection therewith as may be prescribed by law. He shall receive an annual salary of two thousand dollars, which may be increased by the legislature, but shall never exceed three thousand dollars per annum."

Art. III, § 21: "The attorney general shall be the legal adviser of the state officers, and shall perform such other duties as may be prescribed by law. He shall receive an annual salary of two thousand dollars, which may be increased by the legislature, but shall never exceed thirty-five hundred dollars per annum."

Art. III, § 22: "The superintendent of public instruction shall have supervision over all matters pertaining to public schools, and shall perform such specific duties as may be prescribed by law. He shall receive an annual salary of twenty-five hundred dollars, which may be increased by law, but shall never exceed four thousand dollars per annum."

Rem. Rev. Stat., § 10976 [P.P.C. § 953-1], fixed the salary of the lieutenant governor at twelve hundred dollars per annum. (Chapter 116, Laws of 1945, p. 310 (Rem. Supp.

1945, § 10976a), set the salary at three thousand dollars, but this increase could not become effective during the term for which relator Meyers had been elected.) Section 10976 also fixed the salaries of the secretary of state and auditor at three thousand dollars per annum. Section 10976-1 fixed the attorney general's salary at thirty-five hundred dollars per annum, § 10976-2, the state treasurer's at four thousand dollars, and § 10976-3, the superintendent of public instruction at four thousand dollars.

 The state government is composed of three branches: the executive, the legislative, and the judicial—each separate and distinct from the other. Should the executive, by use of the appointive power, attempt to influence legislation, he would be encroaching on the legislative branch. Should this court declare some act of the legislature invalid because we, as judges, did not deem such legislation advisable, this court would be encroaching on the legislative branch. And if the legislature should pass an act and tell this court that the act was constitutional, it would be encroaching on the judicial branch of the government. The law imposes on the courts the duty of determining the constitutionality of any act of the legislature whenever the question is properly presented. True, there is a presumption that every act of the legislature is constitutional. But the ultimate determination of this question rests with the court. The constitution is a solemn mandate by the people themselves, directed to the various branches of the government, and we would be derelict in our duty if we permitted such a mandate to be circumvented, regardless of our personal desires, no matter how expedient such circumvention might appear at the time.

"The duty of the courts to declare void any statute which violates the Constitution is not limited to direct violations, but extends to any evasion or indirection which may be practiced by the legislature. What cannot be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same result. . . .

"It has been said that illegitimate and unconstitutional practices get their first footing by silent approaches and

slight deviations from legal modes of procedure and that the courts must be vigilant to prevent such encroachments." 11 Am. Jur. 724, § 95.

 We are not concerned with any motive which may have actuated the legislature in adopting any legislation. But it is our solemn duty to scrutinize legislation from its four corners, together with all the circumstances surrounding the enactment of such legislation, and then determine, if we can, not necessarily what the legislature said was the purpose of the act, but what it actually intended to accomplish.

The 1945 session of the legislature enacted chapter 195 (the act here in question), entitled:

"AN ACT to facilitate the cooperation of this state with other units of government, establishing the Washington Commission on Interstate Cooperation for that purpose, making an appropriation, and declaring an emergency."

The relevant portions of the act follow:

"SECTION 1. There is hereby established a Commission, to be officially known as the Washington Commission on Interstate Cooperation, which shall consist of seven (7) members to be appointed by the Governor, and which shall hold office at the pleasure of the Governor.

"SEC. 2. It shall be the function of this Commission:

"(1) To carry forward the participation of this state as a member of the Council of State Governments;

"(2) To encourage and assist the legislative, executive, administrative and judicial officials and employees of the state to develop and maintain friendly contact by correspondence, by conference and otherwise with officials and employees of the other states, of the Federal government and of local units of government;

"(3) To endeavor to advance cooperation between this state and other units of government whenever it seems advisable to do so by formulating proposals for, and by facilitating (a) the adoption of compacts, (b) the enactment of uniform or reciprocal statutes, (c) the adoption of uniform or reciprocal administrative rules and regulations, (d) the informal cooperation of governmental offices with one another, (e) the personal cooperation of governmental officials and employees with one another, individually, (f)

the interchange and clearance of research and information, and (g) any other suitable endeavors.

"(4) To do all such acts as will, in the opinion of this commission, enable this state to cooperate effectively with the various state governments in the United States and in assisting the Council of State Governments for that purpose.

"Sec. 3. The Commission shall establish such delegations and committees as it deems advisable, in order that they may confer and formulate proposals concerning effective means to secure inter-governmental harmony, and may perform other functions for the Commission in obedience to its decisions, subject to the approval of the Commission. The member or members of each such delegation or committee shall be appointed by the chairman of the Commission. The Commission may provide such other rules as it considers appropriate concerning the membership and the functioning of any such delegation or committee. The Commission may provide for advisory boards for itself and for its various delegations and committees. . . .

"Sec. 5. The Council of State Governments is hereby declared to be a joint governmental agency of this state and of the other states which cooperate through it. . . .

"Sec. 7. Each member of said Commission shall receive a salary of six thousand dollars ($6,000) per annum: *Provided,* That should the Governor appoint any elected state officer or other state official on said Commission, said officer or official shall receive as compensation for the extra duties imposed by this act the difference between the salary provided herein and the salary provided by law for said officers or officials, and said elected state officer shall hold office and may not be removed from same until the Wednesday after the second Monday in January, 1949, unless said officers or officials resign from their elective office [offices]: *Provided,* That said state elected officers may be removed from the Commission in the manner now provided by law for the removal of each respective elected state officer. Thereafter, said stated elected officers shall be appointed for a term of (4) years under the same terms and conditions provided herein. . . .

"Sec. 9. There is hereby appropriated the sum of forty thousand seven hundred and fifty dollars ($40,750) to carry out the provisions of this act. . . .

"Sec. 11. This act is necessary for the immediate support of the state government and its existing institutions and shall take effect immediately."

The circumstances surrounding the enactment of this legislation will be discussed later. Upon its passage and approval on March 15, 1945, the governor appointed the relators, who are all elected officers of the state; and, since their appointment, the relators Wanamaker, Reeves, Fluent, and Meyers, and, since August, 1945, the relator Troy, have been duly appointed, qualified, and acting members of the commission, and have, up to and including September 30, 1946, been drawing from the state the salaries provided for in the act.

In matters involving considerable public interest, judges often find it difficult to disassociate from their minds impressions gained by rumors, newspaper articles, and commentaries over the radio, and find a conflict between such impressions and their duty to approach each problem with open and unbiased minds.

One safeguard which they have placed upon themselves is the salutary rule that the courts cannot inquire into the motive back of any legislation. But they do have the right, and it is their duty, to determine the intent of the legislature. At times, it is rather difficult to distinguish between motive and intent. "Motive" has been defined in 42 C. J. 561 as:

"An inducement, reason, cause or incentive, for the doing of an act; some cause or reason that moves the will and induces action; that condition of the mind which incites to the action; that which impels the will to action, culminating in a definite result whether it be benign or malign; that which stimulates or incites an action; the mainspring of human action; the moving cause which induces action; the moving power which impels to action for a definite result; the moving power which leads the mind to desire the result and form the purpose. Motive has to do wholly with desire."

"Intent" is defined in 33 C. J. 168 as:

"A design; a determination to do a certain thing; a drift; a mental attitude made known by acts; an aim; an emotion or operation of the mind; an intention; a purpose; personal intention; that which is intended; the constructive purpose of an action, for which the doer may be responsible, although the actual intent was not wrongful; the doing or not doing of an act with the purpose or desire of accomplishing

a certain known effect or result; the fixed purpose of the mind in connection with a given act; *the purpose of the mind, including such knowledge as is essential to such intent; the purpose to use a particular means to effect a certain result.*" (Italics ours.)

So our problem is to determine the purpose of this act. Was it to raise the salaries, or was it to organize the commission? In *State ex rel. Livingston v. Ayer*, 23 Wn. (2d) 578, 161 P. (2d) 429, a case involving the constitutionality of a statute creating in each county an employment statistics commission, passed by the legislature during the same 1945 session, we said, p. 587:

"In approaching this question, we are mindful of the rule as to the presumption of constitutionality of legislative acts, and we are also mindful that it is not within the province of a court to question the wisdom of a legislative act. But we also have in mind the fact that when it becomes the duty of this court to pass upon the constitutionality of an act of the legislature, we must determine whether or not such act does *in fact* violate some provision of the constitution; and, in doing this, if the court performs its full duty, it will not shut its eyes to obvious facts which would compel a conclusion that the act is unconstitutional, and rest a decision that the act is constitutional upon the mere presumption of constitutionality, or upon the rule that we cannot question the wisdom of the legislature in passing the act, or upon some declared policy or purpose contained in the act, which policy or purpose cannot be substantiated."

In *State ex rel. Davis v. Clausen*, 47 Wash. 372, 91 Pac. 1089, this court stated:

"The true intent of the legislature must be gathered from the whole scope of the enactment and the reasons which appear for making the enactment."

The relators attempt to distinguish the *Livingston* case from the one at bar, because there the members of the county employment statistics commission were so by virtue of their county offices, while here, any person in the state is eligible for appointment. Be that as it may, the fact remains that the governor appointed no one but state officers. It is rather significant that the membership is limited to

seven, the salary not to exceed six thousand dollars per annum, and the seven members appointed are the only elected state officers whose present salaries do not exceed six thousand dollars. Section 1 of the act states that the members shall hold office at the pleasure of the governor. But § 7 provides that, should elected state officers be appointed, they may not be removed from office until the Wednesday after the second Monday in January, 1949 (the conclusion of the terms of relators), unless such officers resign from their elective offices. Section 7 then continues:

"*Provided,* That said state elected officers may be removed from the Commission in the manner now provided by law for the removal of each respective elected state officer. Thereafter, said state elected officers shall be appointed for a term of (4) years under the same terms and conditions provided herein."

■ It would seem that the legislature was vitally interested in the welfare of these state officers, rather than in the welfare of the state at large, in the promulgation of the act creating the commission. Any one of these items, standing alone, would have very little weight, but, taken together, they are very persuasive that the purpose of the act was to raise salaries, rather than to establish the commission.

Now, let us consider the history of this legislation. It originally appeared as senate bill No. 205, and provided that the commission should consist of eight members, with a salary of $7,000 each per annum, except that, should elected officers be appointed, their salaries would be the difference between their present salaries and $7,000. The bill provided for an appropriation of $56,750 for the biennium. It was amended in the Senate to reduce the salaries to $6,600, and the appropriation to $50,350. The bill was again amended in the House to reduce the salaries to $6,000, the appropriation to $40,750, and the number of members from eight to seven. The Senate concurred in the House amendments, and the bill was passed by the Senate and House, March 7, 1945, as chapter 195.

It should be noted that each time the bill was amended, the appropriation for the biennium was just sufficient to

provide for the increase in salaries from the elected officers' present salaries to $7,000, $6,600, and $6,000. No provision was made in any of the appropriations for a salary of $7,000, $6,600, or $6,000 for anyone other than those elected officers. Let us examine it further. The following is a list of the members of the commission, their salaries as elected officers, and salaries as members of the commission:

| | Salaries as State Officers | Salaries as Members of Commission |
|---|---|---|
| Lieutenant governor | $1,200 | $4,800 |
| Secretary of state | 3,000 | 3,000 |
| State treasurer | 4,000 | 2,000 |
| State auditor | 3,000 | 3,000 |
| Attorney general | 3,500 | 2,500 |
| Superintendent of public instruction | 4,000 | 2,000 |
| Commissioner of public lands | 5,000 | 1,000 |

The total salaries of the members of the commission for a year would amount to $18,300, or, for the biennium, $36,600. This amount deducted from the appropriation of $40,750, would leave only $4,150 for clerical help and supplies. Not much could be accomplished in two years with this amount in furtherance of the objectives set out in § 2 of the act. It so happened that Otto Case, commissioner of public lands, refused to accept the additional salary, thus making a saving of two thousand dollars for the biennium. But that was not known when the act was being considered, and we are here concerned with the purpose for which the legislation was enacted. Another thing, it is the usual procedure that, when a number of people are called upon to perform certain duties in concert, they will all receive the same compensation. But here, for performing the same services, we have one member of the commission receiving forty-eight hundred dollars and two other members each receiving two thousand dollars.

A scrutiny of the act and the circumstances surrounding its enactment, convinces us beyond a reasonable doubt that the purpose of the act was not "to facilitate the cooperation of this state with other units of government," but was to provide for an increase in compensation to six thousand dollars for these state officers, in contravention of the limitations imposed by the constitution.

■ The relators have cited a number of cases from other jurisdictions holding that, where new duties imposed on officers by the legislature are extrinsic to their common duties provided by law, they are entitled to additional compensation for such services, and such additional compensation does not contravene a constitutional prohibition against the increase. Regardless of what the rule may be in other jurisdictions, this court has held otherwise. In *State ex rel. Livingston v. Ayer, supra,* we said, p. 588:

"Many cases have been before this court involving attempts to raise the salary of public officers during the term for which they were elected or appointed. While in our opinion none of the cases presents a factual situation such as is presented in the instant case, they all bear evidence of the fact that this court has zealously guarded against any attempted violation of § 25, Art. II, and § 8, Art. XI, of our constitution, by whatever method employed to accomplish that end. This court has recognized that, based upon expediency, evasive methods might be used to accomplish indirectly what could not be done directly."

And, on p. 592:

"It may be conceded that we have stated in former decisions that the question of whether or not new duties, which a public officer is required to perform under the provisions of an act passed subsequent to his election, are extrinsic and foreign to the duties which he was required to perform under the law as it existed at the time of his election, may be considered in determining whether or not such officer is entitled to an increase in his salary during the term for which he was elected for performing such additional duties. But we are clearly of the opinion that it should not be the rule, and that it was not the intention of this court in any of its former decisions to say, that for performing additional duties provided by an act passed subsequent to his election, a public officer is entitled to additional salary or compensation during the term for which he was elected, even though such additional duties be extrinsic and foreign to the duties required of him at the time of his election, where it clearly appears, as in the instant case, that such act was passed with an intent to evade the constitutional provision prohibiting an increase in the salary of a county officer or the compensation of a public officer during the term for which he was elected."

But even though we should find, in this case, that the additional duties imposed on these officers by the act in question are extrinsic and foreign to the duties otherwise required of them, and that the legislation was enacted for the purpose of forming the commission, rather than to raise salaries, the act would still contravene the constitution. The people themselves, by placing §§ 16, 17, 19, 20, 21, and 22 of Art. III in the basic law, stated definitely and positively that the salaries of state officers could be raised so high and no higher. In addition to stating that the compensation (not salary) for state officers shall not be increased or diminished during the term for which they have been elected, the people have placed a distinct limitation, as to each of the officers, on the amount of salary each may receive. For instance, as to the superintendent of public instruction, Art. III, § 22, says: "He shall receive an annual salary of twenty-five hundred dollars, which may be increased by law, *but shall never exceed four thousand dollars per annum.*" (Italics ours.) The people realized that the duties of the superintendent of public instruction might be increased from time to time and gave the legislature authority to raise the salary, but placed an absolute limit on it of four thousand dollars per annum. There are similar salary limitations placed against each state officer with the exception of the commissioner of public lands. We may agree that the people, in framing the constitution, did not contemplate inflation or high prices. But the only recourse which relators have is to go to the people themselves for relief, and not to the legislature or the courts.

Furthermore, as to each of such officers, there is a provision in the constitution that he shall perform or discharge such other duties as may be prescribed by law. Respondent, in his brief, has enumerated the various duties which have been prescribed by the legislature from year to year since statehood, required to be performed by the holders of these offices, all without additional compensation. This implies that the legislature, during all of these years, has felt itself bound by these constitutional restrictions as to salaries. We do not wish to be understood as holding that, if a state

officer should be required by the legislature to perform extrinsic duties which would be incompatible with the duties of his particular office, he could not come before this court and be relieved from performing them. But that is as far as our power would extend. We would have no right, because of the constitutional prohibition, to countenance a raise in salary for the performance of such duties.

For the reasons assigned, the writ of mandamus is denied.

STEINERT, ROBINSON, JEFFERS, and ABEL, JJ., concur.

MILLARD, C. J. (concurring)—I concur. See first paragraph of concurring opinion in *State ex rel. Livingston v. Ayer, supra*. One who holds an office under our constitution forfeits such office when he accepts another office or place of trust which is incompatible with office or place of trust already held, and *ipso facto* the first office is vacated.

SIMPSON, J. (dissenting)—The reasons given for my dissent in *State ex rel. Livingston v. Ayer*, 23 Wn. (2d) 578, 161 P. (2d) 429, apply to the instant case.

In considering cases of this nature, we should bear in mind the following well-established rules:

"The rule of law is well settled in this country that the legislative department is not made a special agency for the exercise of specially defined legislative powers, but is intrusted with general authority to make laws at discretion, except where the constitution has imposed limits upon this legislative power. Cooley, Constitutional Limitations, pp. 104, 201. In other words, the constitution of this state is a limitation upon the powers of the legislature, and not a grant of power. Hence, before an act of the legislature may be declared unconstitutional, it must appear that the act is in conflict with some express provision of the constitution which prohibits the act or parts of the act complained of." *State ex rel. Murphy v. McBride*, 29 Wash. 335, 70 Pac. 25.

"It is a rule, become axiomatic by long continued reiteration, that no court will hold a law to be unconstitutional unless such holding is compelled." *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 Pac. 920.

"It is presumed that the statute in question is constitutional and the burden rests upon appellant [the attacking party] to establish clearly its invalidity." *State v. Hanlen*, 193 Wash. 494, 76 P. (2d) 316.

"It is further elementary, and both parties so admit, that all doubts as to whether or not a state legislature had the power to pass a given enactment must be resolved in favor of the legislature." *State ex rel. Todd v. Yelle,* 7 Wn. (2d) 443, 110 P. (2d) 162.

"It is an elementary principle of constitutional law, universally accepted, that, where the validity of a statute is assailed, there is a presumption of the constitutionality of the legislative enactment unless its repugnancy to the constitution clearly appears or is made to appear beyond a reasonable doubt. . . . This court has upheld that principle many times." *Union High School Dist. No. 1 v. Taxpayers of Union High School Dist. No. 1,* 26 Wn. (2d) 1, 172 P. (2d) 591.

"In order to justify a court in pronouncing a legislative act unconstitutional or a provision of a state Constitution to be in contravention of the Constitution of the United States, the case must be so clear as to be free from doubt. In those jurisdictions in which a trial court may consider the constitutionality of a statute, unless a statute is manifestly and plainly unconstitutional, a trial court should sustain it, particularly where the same question might arise in other counties of the state, in order that a final and uniform decision may be had on appeal.

"In all instances where the court exercises its power to invalidate, the conflict of the statute with the Constitution must be irreconcilable, because it is only a decent respect to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity until the contrary is shown beyond reasonable doubt. Therefore, in no doubtful case will the judiciary pronounce a legislative act to be contrary to the Constitution; to doubt the constitutionality of a law is to resolve the doubt in favor of its validity." 11 Am. Jur. 719, Constitutional Law, § 92.

It is also a general rule that the bar of the constitution does not come into play in those cases in which extra compensation is provided for new duties extrinsic to the duties provided by the constitution.

This rule is well stated as follows in *State ex rel. Younger v. Clausen,* 111 Wash. 241, 190 Pac. 324:

"The general rule supported by the authorities is that, where new duties are added to the office during the term and

the act fixes the compensation therefor, the constitutional inhibition does not apply if such new duties are extrinsic or foreign to the prior duties. On the other hand, if the new duties are incidental, collateral or germane to the duties which the officer was required to perform under the prior law, the salary increase cannot be sustained. The question is not so much over the statement of the rule as it is the application thereof. Probably the best statement of the rule will be found in §§ 862 and 863 of Mecham on Public Officers, as follows:

" 'An officer who accepts an office, to which a fixed salary or compensation is attached, is deemed to undertake to perform its duties for the salary or compensation fixed, though it may be inadequate, and if the proper authorities increase its duties by the addition of others germane to the office, the officer must perform them without extra compensation. Neither can he recover extra compensation for incidental or collateral services which properly belong to or form a part of the main office. . . .

" 'Where, therefore, a public officer is employed to render services in an independent employment, not germane or incidental to his official duties, . . . he may recover for such services.' "

Accord: *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428; 43 Am. Jur. 145, 151, Public Officers, §§ 353, 364; 46 C. J. 1017, Officers, § 242.

In addition to the cases I cited in the *Livingston* case, I desire to call attention to the following:

The case of *Love v. Baehr,* 47 Cal. 364, involved the creation by the legislature of a board of examiners whose duties were to examine claims against the state, the books of the state treasurer, and to perform other similar functions. It named the attorney general as a member of the board and provided extra compensation. The California court held that the attorney general could receive the compensation, it being for extrinsic duties. The court, in passing upon the question, stated in part as follows:

"The Legislature has no more power to compel the Attorney-General to perform such service as a part of the duties of his office, than it has to compel the Superintendent of Public Instruction to take charge of the State Prison, or to perform the duties of State Gauger. The Attorney-

General is, therefore, under no obligation to perform such services, and he may decline to perform them, without any breach of his official duty as Attorney-General. If, however, he voluntarily performs them, he does not thereby enlarge the scope of his official duties as a constitutional officer. . . .

"It is true, as suggested by counsel, that the Legislature might abuse its trust, and perhaps partially evade the constitutional prohibition, by contracting with these officers for the performance of trivial, non-official services, at an exorbitant compensation. But all legislative power is subject to abuse; and under our form of government, the only remedy is to be found at the ballot-box."

A similar situation was present in *Phelps v. Childers*, 184 Okla. 421, 89 P. (2d) 782. There, it appears that a statute provided that justices of the supreme court should compile and annotate certain statutes, and compensation for the performance of those duties was authorized. The compensation provided for by this statute, in the opinion of the Oklahoma court, did not violate the constitutional provision relative to the changing of salaries of public officers after their election or appointment. The court reviewed the cases and held that where, as here, the duties were foreign to those provided for by the constitution, it is proper to award extra compensation.

In *Coleman v. Hurst*, 226 Ky. 501, 11 S. W. (2d) 133, the Kentucky legislature created a judicial council and outlined the duties of that board. Circuit judges were named as members, and a compensation in addition to their regular salaries was allowed. The supreme court upheld the constitutionality of the act in the following words:

"The duties of members of the Judicial Council are not duties added to the office of circuit judge, for which no compensation may be allowed during the term, but the duties are wholly outside of the duties which a circuit judge is required to perform, and, therefore, under the many cases cited, the compensation is legal, and the act does not violate any of the provisions of the Constitution relating to compensation to be paid out of the state treasury."

In accord with the cases just cited are *State ex rel. McMaster v. Reeves*, 44 S. D. 612, 184 N. W. 1007; *Moore v.*

*Moore*, 147 Va. 460, 137 S. E. 488, 51 A. L. R. 1517; and *State v. Roddle*, 12 S. D. 433, 81 N. W. 980.

This court in the case of *State ex rel. Seattle v. Carson*, 6 Wash. 250, 33 Pac. 428, laid down a rule that is in conformity with those to which I have just called attention.

To my mind, the duties provided for in the act under consideration are entirely foreign and extrinsic to those which the various officers are compelled to perform by provisions of the constitution.

Rem. Supp. 1945, § 10964-51, provides:

"Functions. It shall be the function of this Commission:

"(1) *To carry forward the participation of this state as a member of the Council of State Governments;*

"(2) *To encourage and assist the legislative, executive, administrative and judicial officials and employees of the state to develop and maintain friendly contact by correspondence, by conference and otherwise with officials and employees of the other states, of the Federal government and of local units of government;*

"(3) *To endeavor to advance cooperation between this state and other units of government whenever it seems advisable to do so by formulating proposals for, and by facilitating (a) the adoption of compacts, (b) the enactment of uniform or reciprocal statutes, (c) the adoption of uniform or reciprocal administrative rules and regulations, (d) the informal cooperation of governmental offices with one another, (e) the personal cooperation of governmental officials and employees with one another, individually, (f) the interchange and clearance of research and information, and (g) any other suitable endeavors.*

"(4) To do all such acts as will, in the opinion of this Commission, enable this state to cooperate effectively with the various state governments in the United States and in assisting the Council of State Governments for that purpose."

There is nothing in the state constitution quoted in the majority opinion that directly, or by implication, requires the lieutenant governor, the secretary of state, the state treasurer, the state auditor, the attorney general, or the superintendent of public instruction, to do or perform any of the duties demanded by the 1945 act. The duties men-

tioned in that act which I have emphasized by italics, prove conclusively that they are entirely foreign to the duties set out in the constitution.

The duties of the members of the commission are real and substantial, and require the exercise of discretion. They require the giving of time and the performance of services within and without the state of Washington. Every state in the Union, with possibly one or two exceptions, has provided for a body of the type fashioned by chapter 195, Laws of 1945, and it was the evident purpose of the legislature that Washington should not stand alone, but should have a commission that would work in conjunction with the commissions from other states to advance the cause of uniform laws and bring about a working organization with the governmental bodies of sister states.

Courts take judicial notice of the fact that for many years business organizations and bar associations have worked together in an effort to bring about the passage of laws in various states that would make for better business relations. Law colleges and their faculties, and writers of legal publications, have advocated the passage of many uniform laws by the various states in the Union.

I cannot see anything in the present act which is prohibited by our state constitution.

The only thing that can be complained of is the fact that the governor appointed state officials to hold positions on the council created by the act.

MALLERY, J., concurs with SIMPSON, J.

CONNELLY, J. (specially concurring in Judge Simpson's dissent)—I concur with Judge Simpson and for all of the reasons expressed in his opinion. I am particularly impressed by his recital that twenty-eight states of the Union have interstate co-operation commissions, composed of state officials, similar to that which was designed by the statute under discussion.

I do not believe that the amounts of salary or the minimum amount for clerk hire in any way touches or affects the constitutionality of this statute. The purpose of the act is

a salutary one for the general good of the state and the efficient co-operation upon matters of mutual governmental interest with other states.

My further reason for being unable to concur with the majority opinion is that this court has long been committed to the rule that no judge shall declare an act of the legislature unconstitutional unless he himself, in his own judicial conscience, is convinced beyond a reasonable doubt of the unconstitutionality of the law in question. For the many reasons pointed out in Judge Simpson's dissent, I cannot, with sincerity, say that I am convinced beyond a reasonable doubt that the interstate co-operation commission act does violence to our state constitution.

[1]Reported in 176 P. (2d) 436.