[No. 43398.     En Banc.     April 17, 1975.]

THE CITY OF TACOMA et al, *Petitioners*, v. ROBERT S. O'BRIEN, as *Treasurer of State, Respondent*, THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., et al, *Intervenors*.

*Robert R. Hamilton* and *F. H. Chapin, Jr.*, by *Don L. Hogaboam* and *Floyd Oles*, for petitioner City of Tacoma.

*Ronald L. Hendry, Prosecuting Attorney*, and *Robert J. Backstein, Chief Civil Deputy*, by *Mark L. Bubenik, Deputy*, for petitioner County of Pierce.

*Kenneth R. Ahlf* (of *Oberquell & Ahlf*), for petitioner City of Lacey.

*Slade Gorton, Attorney General*, and *Joseph S. Montecucco, Assistant*, for respondent.

*Carney, Stephenson, Siqueland, Badley, Smith & Mueller*, by *Herman S. Siqueland, Milton C. Smith*, and *Nicholas P. Scarpelli, Jr.*, for intervenors Associated General Contractors of America, Inc., et al.

*Short, Cressman & Cable*, by *Kenneth P. Short* and *Joseph D. Puckett*, for intervenor Asphalt Paving Association.

BRACHTENBACH, J.—Petitioners, two cities, a county and an individual taxpayer, seek a writ of mandamus to prohibit the State Treasurer from disbursing funds pursuant to Laws of 1974, 1st Ex. Sess., ch. 194. Various affected parties intervened. The writ shall issue.

The challenged legislation, set out in the appendix, was enacted for the purpose of relieving public works contractors, whose contracts were awarded prior to November 1, 1973, from financial hardship caused by the substantial in-

crease in the cost of petroleum products. As relevant to this case, the act provides that where the cost of petroleum products needed for the performance of a public works contract increased by more than 20 percent over the price at the time of contracting, the contractor can either terminate the entire contract or delete that portion of the contract requiring such products. The contractor's authorization to terminate or delete is subject to the following qualification. If the contractor elects to terminate or delete, the state or municipality can nevertheless require completion of the contract if completion is in the public interest, but the state or municipality must then pay 80 percent of the increased petroleum costs. The act applies only to contracts awarded *prior* to November 1, 1973. According to the stipulated facts in this action, more than 35 notices of termination or deletion have been received by the State. In nine instances the State determined that performance was in the public interest and agreed to pay 80 percent of the increased costs. It is with respect to these payments that petitioners seek mandamus.

Two procedural matters must be addressed at the outset, the first pertaining to mandamus. Article 4, section 4 of our state constitution gives to this court original jurisdiction in mandamus as to all state officers, but that jurisdiction is not exclusive. Whether this court will exercise original jurisdiction depends upon the nature of the interests involved. *State ex rel. Malmo v. Case*, 25 Wn.2d 118, 169 P.2d 623 (1946). Because this case concerns the constitutionality of a statute and involves issues relating to the expenditure of public funds, we consider the matter to be of sufficient public importance to warrant our exercise of original jurisdiction. Also, while it is true that mandamus is ordinarily used to compel a public officer to perform a duty required by law, this court has previously determined that the writ may also be used to prohibit the doing of an act. *State ex rel. O'Connell v. Yelle*, 51 Wn.2d 620, 320 P.2d 1086 (1958). Therefore, we conclude that the case is properly before this court.

Also raised is the issue of petitioners' standing to bring this action. Petitioners brought this action as taxpayers. It is well settled that taxpayers, in order to obtain standing to challenge the act of a public official, need allege no direct, special or pecuniary interest in the outcome of their action, there being only a condition precedent to such standing that the Attorney General first decline a request to institute the action. *Reiter v. Wallgren*, 28 Wn.2d 872, 184 P.2d 571 (1947); *Fransen v. State Bd. of Natural Resources*, 66 Wn.2d 672, 404 P.2d 432 (1965). That condition was met in this case, and we perceive no justifiable reason to apply a different standard where a county or municipality brings the action. In this case a question is raised as to the propriety of a rather substantial expenditure of public funds, and it should not matter whether that question is raised by a private citizen or a governmental entity.

Petitioners' principal contention is that disbursements made pursuant to the act would constitute gifts of public funds and would violate article 2, section 25, of the state constitution, which provides:

The legislature shall never grant any extra compensation to any public officer, agent, employee, servant, or contractor, after the services shall have been rendered, or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office. Nothing in this section shall be deemed to prevent increases in pensions after such pensions shall have been granted.

and article 8, section 5, which provides:

The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.

The response to this constitutional challenge is based upon a statement in the introductory section of the act:

The legislature finds . . . that the increase in the price of petroleum products resulting from the world wide shortage of crude oil has created a condition which

has rendered performance by contractors of many public works contracts economically impossible . . .

Laws of 1974, 1st Ex. Sess., ch. 194.

It is argued that the legislature's finding of economic impossibility is conclusive and that economic impossibility excused the contractors from completing performance under the existing contracts. It follows from that premise that disbursements made pursuant to the challenged act would merely be consideration for new contractual obligations and, therefore, not violative of constitutional proscriptions against legislative gifts of public funds. This theory rests, of course, upon the validity of the legislature's "finding" that performance of certain contracts had become economically impossible. Parenthetically we note that regarding the contracts in the record the State's 80 percent share of increased petroleum costs was only .0233 percent of the total contract prices. The theory fails because the legislature has no power to make such a judicial determination.

Legislatures must necessarily make inquiries and factual determinations as an incident to the process of making law, and courts ordinarily will not controvert or even question legislative findings of facts. For example, in *State ex rel. Govan v. Clausen*, 108 Wash. 133, 183 P. 115 (1919), where the legislature had appropriated funds for the payment of services and materials furnished to the State and stated in the act that payment had not been made, this court declined to undertake a separate judicial determination as to whether payment had in fact previously been made. Similarly, courts will not inquire into a legislative determination that salmon caught outside state boundaries are indistinguishable from those caught within territorial waters, *Frach v. Schoettler*, 46 Wn.2d 281, 280 P.2d 1038 (1955); that a particular use of natural gas is wasteful, *Townsend v. State*, 147 Ind. 624, 47 N.E. 19 (1897); that cattle are infested with the cattle fever tick, *McSween v. State Live Stock Sanitary Bd.*, 97 Fla. 750, 122 So. 239, 65 A.L.R. 508 (1929); or that certain public conditions exist, *Block v.*

*Hirsh*, 256 U.S. 135, 65 L. Ed. 865, 41 S. Ct. 458, 16 A.L.R. 165 (1921).

While a court will not controvert legislative findings of fact, the legislature is precluded by the constitutional doctrine of separation of powers from making *judicial* determinations. Courts have generally recognized the distinction between legislative and judicial determinations and have carefully preserved judicial functions from legislative encroachment. For example, in *State Highway Comm'n v. Pacific Northwest Bell Tel. Co.*, 59 Wn.2d 216, 222, 367 P.2d 605 (1961), this court declared: "The construction of the meaning and scope of a constitutional provision is exclusively a judicial function." In *Plummer v. Gaines*, 70 Wn.2d 53, 58, 422 P.2d 17 (1966), this court stated:

> [T]he legislature may not determine what constitutes a "general election" within the purview of a constitutional provision, for such a determination involves an interpretive process or function which, in the final legal analysis, under our system of government, is reposed in the judicial branch.

Courts from other jurisdictions have declared that the legislature cannot determine the existence of liability under insurance policies, *State Farm Mut. Auto. Ins. Co. v. Christensen*, 88 Nev. 160, 494 P.2d 552 (1972); cannot declare conclusively what constitutes "adulterated food," *State v. A.J. Bayless Mkts., Inc.*, 86 Ariz. 193, 342 P.2d 1088 (1959); cannot interpret provisions of a will, *Hartford v. Larrabee Fund Ass'n*, 161 Conn. 312, 288 A.2d 71 (1971); cannot determine whether a particular use of property is "charitable," *People ex rel. Nordlund v. Association of Winnebago Home*, 40 Ill. 2d 91, 237 N.E.2d 533 (1968); cannot determine what constitutes "just compensation," *State Plant Bd. v. Smith*, 110 So. 2d 401 (Fla. 1959); *Buffalo v. J.W. Clement Co.*, 28 N.Y.2d 241, 269 N.E.2d 895, 321 N.Y.S.2d 345 (1971); cannot determine legal liability in a tort case, *Koehler v. Massell*, 229 Ga. 359, 191 S.E.2d 830 (1972); and cannot determine who is entitled to office in a

disputed election, *State ex rel. Worrell v. Carr*, 129 Ind. 44, 28 N.E. 88 (1891).

■■ All these cases involve the element of adjudication, and we believe that a finding of "economic impossibility" is similarly adjudicatory. A legislature can declare that economic impossibility shall constitute, in the future, a defense in actions involving contractual disputes. A legislature can find that a worldwide shortage of petroleum exists. Finding that existing contracts, entered into at least 6 months prior to the legislation, have become economically impossible to perform, however, is a legal conclusion, a result which follows from examination and consideration of circumstances in a particular case and interpretation and application of legal principles to those facts. As Mr. Justice Holmes wrote in *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226, 53 L. Ed. 150, 29 S. Ct. 67 (1908);

> A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter . . .

We hold, therefore, that making a determination of economic impossibility is a function exclusively judicial, and a legislative attempt to make such an adjudication violates the separation of powers doctrine and is void. It follows that the challenged act is invalid.

As a final matter, it is noted that the act contains a severability clause and the argument is made that the contractors' right to terminate their contractual obligations would remain, even where the section providing for extra compensation is found unconstitutional. Our holding that the legislature cannot adjudicate with respect to contractual obligations disposes of the severability argument.

A writ shall issue, directed to the State Treasurer, prohibiting him from honoring any warrants or paying any funds pursuant to the terms of Laws of 1974, 1st Ex. Sess., ch. 194.

STAFFORD, C.J., FINLEY, ROSELLINI, HUNTER, HAMILTON, and WRIGHT, JJ., and CUNNINGHAM, J. Pro Tem., concur.

APPENDIX

NEW SECTION. Section 1. There is added to chapter 39.04 RCW a new section to read as follows:

(1) The legislature finds (a) that the increase in the price of petroleum products resulting from the world wide shortage of crude oil has created a condition which has rendered performance by contractors of many public works contracts economically impossible and (b) that provision should be made to provide for the orderly termination of such contracts; the deletion of work affected by petroleum prices without the necessity of litigation; or, alternatively at the election of any contracting agency, the continuation of the contract with the agency assuming a share of the increased petroleum costs.

(2) Whenever the state or any municipality shall have awarded any public works contract during the performance of which (a) any legally enforceable private agreement or contractual arrangement between either the contractor or a first tier subcontractor and his suppliers of crude oil, residual fuel oil, refined petroleum products, or asphalt required in order to complete performance of the public works contract are superseded, with resulting increased costs of performance of the public works contract, by force majeure regulations, rules, allocations, or rulings issued by any federal, state, or other agency acting pursuant to any federal or state economic stabilization act, petroleum allocation act, or other legislation authorizing the same; or (b) the cost of petroleum products for which has increased by more than twenty percent over the current market price thereof as the date of contract award, then the contractor may elect to terminate the contract in its entirety or to delete such portions of the work from the contract, and the state or municipality shall pay the contractor for all work performed prior to the date of termination of the contract or deletion of such work. The state or municipality shall also pay the contractor for all acceptable materials ordered by the contractor and delivered on the work site prior to the termination of the contract or deletion of such work by the contractor. Such materials shall be purchased from the contractor by the state or the municipality at the actual cost of such material to the contractor and shall thereupon become the property of the state or municipality. No payment shall be made to the contractor for overhead costs or anticipated profits as to work not performed as a result of deletion of such work or termination of the contract. Amounts retained and accumulated under RCW 60.28.010 shall be held for a period of thirty days following the election of the contractor to terminate the contract in its entirety: PROVIDED, That if the contractor elects to terminate or delete such portions of the work and the state or such municipality finds that it is in the public interest to complete performance on such public works contract then the state or such municipality shall require the contractor to complete performance of the public

works contract and the state or such municipality shall modify the provisions of that public works contract to increase the contract price so that the state or municipality shall bear eighty percent of such increased costs over the contractor's estimated cost at the time of contract bid opening and the contractor shall bear the balance thereof. Upon request by the state or municipality the contractor shall make his records available for audit by the state or municipality to verify such increased costs.

(3) This section shall apply only to public works contracts awarded prior to November 1, 1973, and only to work under such contracts which has not been performed on the date the contractor elects to terminate the contract or delete such work from the contract.

NEW SECTION. Sec. 2. If any provision of this act, or its application to any person or circumstance is held invalid, the remainder of the act, or the application of the provision to other persons or circumstances is not affected.

NEW SECTION. Sec. 3. This 1974 act is necessary for the immediate preservation of the public peace, health and safety, the support of the state government and its existing public institutions, and shall take effect immediately.