[No. 48806–1. En Banc. April 21, 1983.]

MICHAEL P. FARRIS, *Petitioner*, v. RALPH MUNRO, *as Secretary of State*, ET AL, *Respondents*.

*Michael P. Farris,* pro se.

*Kenneth O. Eikenberry, Attorney General,* and *Thomas R. Bjorgen, Assistant,* for respondents.

BRACHTENBACH, J.—This case involves a challenge to the recently established state lottery. That challenge resulted in a petition for a writ of mandamus to declare the lottery statute unconstitutional and compel the Secretary of State to accept petitioner's filing of a proposed referendum opposing the statute. We denied the petition on the day of oral argument, concluding that the original constitutional amendment allowing lotteries, the 56th amendment, is constitutional and that the lottery act is exempt from referenda under the terms of the 7th amendment. Const. art. 2, § 24 (amend. 56); Const. art. 2, § 1 (amend. 7).

The disputed legislation was passed during an extraordinary session of the Legislature called by the Governor in response to a "fiscal and budgetary crisis." In calling the session, the Governor requested the Legislature to "modify laws relating to the revenue and expenditures of the state." The Legislature responded in part by passing the state lottery bill on July 1, 1982, codified as RCW 67.70.010–.903 (hereinafter Act). The Act created a statewide lottery system under the administration of a director and a 5-member commission. The commission is directed to "produce the maximum amount of net revenues for the state consonant with the dignity of the state and the general welfare of the people." RCW 67.70.040(1). Annual gross revenues from the lottery are to be distributed as follows: (1) at least 45 percent to be paid as prizes; (2) at least 40 percent to be transferred to the state general fund; and (3) no more than 15 percent to pay for the costs of administration. RCW 67.70.040(1)(k).

The petitioner, Michael Farris, opposed the Act and attempted to have it submitted to the voters in the form of a referendum. This state's referendum provisions empower the people to approve or reject laws passed by the Legislature. Const. art. 2, § 1; Trautman, *Initiative and Referendum in Washington: A Survey,* 49 Wash. L. Rev. 55 (1973).

On July 7, 1982, an initial referendum petition was submitted to respondent Secretary of State, as required under RCW 29.79.010. The Secretary of State refused to accept that initial petition since Governor Spellman had not signed the bill. Petitioner then filed a petition in this court for a writ of mandamus, which initiated a series of petitions and hearings. The parties ultimately agreed to allow petitioner to submit a third amended petition. This final petition added Governor Spellman as a respondent, sought an injunction against enforcement of the Act, and reiterated the claim that the Act was unconstitutional.

The first issue is whether petitioner had standing to challenge the constitutionality of the State Lottery Act. Petitioner characterizes himself as a taxpayer, allegedly attempting to restrain the unlawful expenditure of state funds. In Washington, absent statutory authorization, a taxpayer does not have standing to challenge the legality of the acts of public officers unless he first requests or demands that a proper public official bring suit on behalf of all taxpayers. *Tacoma v. O'Brien*, 85 Wn.2d 266, 269, 534 P.2d 114 (1975); *Reiter v. Wallgren*, 28 Wn.2d 872, 876–77, 184 P.2d 571 (1947). Once such a request is refused, the taxpayer has standing to bring the suit. An exception to this demand requirement allows a party to allege facts showing that such a demand would have been useless. *Reiter v. Wallgren, supra* at 877–78. In the instant case, petitioner failed to make a request upon the Attorney General to bring suit, and does not allege any facts indicating that such a request would have been useless. He instead argues that because the Attorney General is the opposing counsel in this case, defending the validity of the Act, it obviously would have been useless to request that the Attorney General bring suit to oppose the same Act. That argument, however, ignores this court's explicit holding that even though the Attorney General is defending against the taxpayer's suit such a demand is not considered useless. *Reiter v. Wallgren, supra* at 877–78. The *Reiter* court reached that conclusion because such a defense is part of

the Attorney General's statutory duties, and in some instances the Attorney General must both prosecute and defend a suit. *See, e.g., State ex rel. Troy v. Yelle,* 27 Wn.2d 99, 176 P.2d 459, 170 A.L.R. 1425 (1947); RCW 43.10.030.

Despite petitioner's failure to satisfy these standing requirements, he raised an issue vital to the state revenue process that remained unresolved at the time of this suit and might have affected a measure on the November 1982 ballot. Thus, the case presented issues of significant public interest that, by analogy to other decisions, allow this court to reach the merits. In suits not involving taxpayers this court has recognized that standing questions should be analyzed in terms of the public interests presented.

> Where a controversy is of serious public importance and immediately affects substantial segments of the population and its outcome will have a direct bearing on the commerce, finance, labor, industry or agriculture generally, questions of standing to maintain an action should be given less rigid and more liberal answer.

*Washington Natural Gas Co. v. PUD 1,* 77 Wn.2d 94, 96, 459 P.2d 633 (1969); *accord, Vovos v. Grant,* 87 Wn.2d 697, 701, 555 P.2d 1343 (1976). In another context, we recently decided to not dismiss a case for failure to join an indispensable party and instead reached the substantive issue presented where that

> issue is a matter of continuing and substantial interest, it presents a question of a public nature which is likely to recur, and it is desirable to provide an authoritative determination for the future guidance of public officials.

*Cathcart–Maltby–Clearview Comm'ty Coun. v. Snohomish Cy.,* 96 Wn.2d 201, 208, 634 P.2d 853 (1981). That rationale is derived from some of our decisions involving moot questions, *e.g., In re Patterson,* 90 Wn.2d 144, 149, 579 P.2d 1335 (1978), and similar considerations lead us to address the substantive issues presented here.

The initial argument is that the Act is unconstitutional because the 56th amendment, which allows lotteries,

was invalidly adopted since it included two subjects when submitted to the voters. The language of the 37th amendment prohibits the adoption of dual subject amendments:

if more than one amendment be submitted [to the people], they shall be submitted in such a manner that the people may vote for or against such amendments separately.

Const. art. 23, § 1 (amend. 37). The original constitutional provision governing lotteries stated: "[t]he legislature shall never authorize any lottery or grant any divorce." Const. art. 2, § 24. In 1972, amendment 56 was adopted, changing the relevant provisions as follows:

The legislature shall never grant any divorce. Lotteries shall be prohibited except as specifically authorized upon the affirmative vote of sixty percent of the members of each house of the legislature or, *notwithstanding any other provision of this Constitution,* by referendum or initiative approved by a sixty percent affirmative vote of the electors voting thereon.

(Italics ours.) Const. art. 2, § 24 (amend. 56). In effect, the amendment retained the prohibition against the Legislature granting a divorce, but replaced the absolute prohibition against lotteries with a conditional authorization.

In order to constitute multiple amendments within the meaning of the 37th amendment:

the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other.

*Gottstein v. Lister,* 88 Wash. 462, 470, 153 P. 595 (1915) (quoting *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N.W. 785 (1882)). In the present case, divorce and lotteries appear to be such distinct and separate subjects. However, the absolute prohibition against the Legislature granting a divorce was not changed from the original provision to the amendment. The 56th amendment only removed the prohibition against lotteries and replaced it with a conditional authorization. Therefore, the voters only had to decide whether to approve or disapprove the single amendment relating to lotteries, irrespective of their preference on the

divorce provisions. The primary objection to amendments with more than one subject is that the voters must approve or disapprove the entire measure as a whole, rather than vote separately for or against each subject. *Gottstein v. Lister, supra* at 471–72; *see generally* Annot., 94 A.L.R. 1510 (1935). This practice is sometimes referred to as "log-rolling", but it is not present in the instant case because irrespective of the outcome of the vote on the lottery amendment the constitutional prohibition against legislative grants of divorce remained in force. If the lottery amendment were approved it included the divorce prohibition; if rejected, the original provisions prohibiting both divorce and lottery remained in effect. Thus, the voters were not faced with a combined proposition that required the support of an objectionable provision in order to secure passage of a preferred provision. *See, e.g., Idaho Water Resource Bd. v. Kramer,* 97 Idaho 535, 550–53, 548 P.2d 35 (1976). Also, the voter's pamphlet explanation of amendment 56 clearly indicated that the voters were only deciding whether to amend the constitution in regard to lotteries. Official Voters Pamphlet 40–41, 102 (1972). Consequently, we hold that the 56th amendment, as adopted, did not violate the 37th amendment.

The next issue is whether the lottery act is subject to the referendum process. The state constitution provides for the right to a referendum in the following manner:

(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, *except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions,* either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted. Six per centum, but in no case more than thirty thousand, of the legal voters shall be required to sign and make a valid referendum petition.

. . .

(d) . . . Any measure initiated by the people or re-ferred to the people as herein provided shall take effect and become the law if it is approved by a majority of the votes cast thereon . . .

(Italics ours.) Const. art. 2, § 1(b), (d) (amend. 7). The ital-icized language provides the exceptions to the referendum process which exempt legislation promulgated as either an emergency measure or in support of public institutions. This court has consistently analyzed this language as creat-ing separate and distinct exceptions, *State ex rel. Hoppe v. Meyers*, 58 Wn.2d 320, 326, 363 P.2d 121, 100 A.L.R.2d 304 (1961), although both provisions are sometimes referred to as the "emergency clause." Trautman, *Initiative and Ref-erendum in Washington: A Survey, supra* at 74. The lot-tery bill contained an emergency clause purportedly exempting the Act from referendum. Laws of 1982, 2d Ex. Sess., ch. 7, § 41, p. 1545. However, petitioner contends the express language of the 56th amendment, *supra,* precludes the application of the emergency exception. He essentially asks this court to interpret the phrase "notwithstanding any other provision of this Constitution" to override the 7th amendment's exceptions to referenda. This we will not do.

This issue requires reconciling the 56th amendment's lottery enactment requirements with the 7th amendment's exceptions to referenda. Petitioner would "reconcile" the amendments by interpreting the 56th amendment simply to repeal the 7th amendment exceptions. The construction of these two amendments, however, is not quite so literal.

■ Petitioner's primary argument is that unless the "notwithstanding" clause of the 56th amendment is inter-preted to grant a paramount right to referendum, the lan-guage is meaningless. Admittedly, constitutional provisions shall not be interpreted as mere redundancies. *See Darrin v. Gould*, 85 Wn.2d 859, 871, 540 P.2d 882 (1975). It is also correct that the constitution, like statutes, should be con-strued so that no portion is rendered superfluous. *Sim v. State Parks & Rec. Comm'n,* 90 Wn.2d 378, 383, 583 P.2d

1193 (1978). Respondents, however, are also correct in arguing that this court has analyzed legislation that includes clauses generally repealing inconsistent provisions, and determined that such clauses may be identified as surplusage and given no independent effect. *Port of Seattle v. State Utils. & Transp. Comm'n,* 92 Wn.2d 789, 798–800, 597 P.2d 383 (1979).

In analyzing repealing language in legislation, it is necessary to identify initially the type of repeal employed, *i.e.,* express or implied, and then to determine the scope of repeal. A clause which does not contain an express repeal designating what it is repealing, such as the 56th amendment provision, must be analyzed as a repeal by implication. 1A C. Sands, *Statutory Construction* §§ 23.07–.09 (4th ed. 1972). Repeals by implication are not favored at law and will be found only if:

> (1) the later act covers the entire subject matter of the earlier legislation, is complete in itself, and is evidently intended to supersede prior legislation on the subject; or (2) the two acts are so clearly inconsistent with, and repugnant to, each other that they cannot be reconciled and both given effect by a fair and reasonable construction.

*U.S. Oil & Ref. Co. v. Department of Ecology,* 96 Wn.2d 85, 88, 633 P.2d 1329 (1981). Considering the first part of the test quoted above, it seems clear that the 56th amendment was not intended to supersede the 7th amendment, nor does it cover the entire subject matter of the prior provisions since the earlier amendment also included the divorce provisions. Considering the second part of the test, it is possible to reconcile the provisions of both amendments and give each a fair and reasonable construction.

▪ To reconcile these provisions, the 56th amendment "notwithstanding" clause may be read to override only the general simple majority requirement for referenda contained in the 7th amendment, but not to override the two exceptions. In this sense, the later amendment replaces the simple majority requirements with a 60 percent "super-

majority". A primary guide to the interpretation of constitutional provisions is legislative history. *State ex rel. PUD 1 v. Wylie*, 28 Wn.2d 113, 127, 182 P.2d 706 (1947). The legislative history indicates a predominant concern with the 60 percent requirements for authorizing a lottery. In response to the inquiries of several senators, Senator Walgren described the measure as requiring 60 percent approval of any initiative or referendum establishing a lottery. Senate Journal, 42d Legislature (1971), at 486–87. Moreover, there is no specific reference in the legislative history to the "notwithstanding" clause as overriding the 7th amendment. Similarly, the relevant voter's pamphlet described the proposed amendments as authorizing a lottery by either: (1) an act of the Legislature approved by 60 percent of the members of both houses; or (2) an initiative or referendum approved by 60 percent of the voters. Official Voters Pamphlet 40–41 (1972). Therefore, based upon our analysis of the language used in each amendment as well as the legislative history, we conclude that the 56th amendment does not override the exceptions to the referendum process set out in the 7th amendment.

 The next question is whether the lottery act is immune from referendum under the 7th amendment exceptions. The lottery bill contained an emergency clause purportedly exempting it from referendum.[1] This court has interpreted the exceptions to that amendment as if they read:

> [except] such laws as may be necessary for the immediate preservation of the public peace, health or safety, [or] support of the state government . . .

*State ex rel. Hoppe v. Meyers*, 58 Wn.2d 320, 326, 363 P.2d 121 (1961). The court explained that the word "or" apparently was omitted inadvertently, so the phrase had been interpreted consistently as though it had not been omitted.

---

[1]The clause stated: "This act is necessary for the immediate preservation of the public peace, health, and safety, the support of the state government and its existing public institutions, and shall take effect immediately." Laws of 1982, 2d Ex. Sess., ch. 7, § 41, p. 1545.

*See also State ex rel. Helm v. Kramer,* 82 Wn.2d 307, 312–13, 510 P.2d 1110 (1973); *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 P. 28 (1915). An early decision provided the reasons for this interpretation:

> Several years before the legislature submitted [amendment 7] . . . the people of Oregon had adopted the initiative and referendum with practically no limitations. Their constitution reads, "except as to laws necessary for the immediate preservation of the public peace, health, or safety."
>
> It was a matter of common knowledge that, under this unbridled license to refer legislation, the state university had been denied the benefit of an appropriation for its support and maintenance . . .
>
> . . . We may well assume that the people of this state had no intention of falling into the error that Oregon had made . . .

*State ex rel. Blakeslee v. Clausen, supra* at 267. In adherence to that original policy distinction, this court consistently has held that the 7th amendment contains two separate and distinct exceptions to the right of referendum. *State ex rel. Helm v. Kramer, supra* at 312. Moreover, the second exception, necessary "for the support of state government", does not require either immediacy or an emergency. *State ex rel. Helm v. Kramer, supra* at 312; *State ex rel. Blakeslee v. Clausen, supra* at 274; Trautman, at 73. Also, support is not limited to appropriation measures; if it generates revenue for the state it is deemed support. *State ex rel. Reiter v. Hinkle,* 161 Wash. 652, 657–60, 297 P. 1071 (1931).

This court recently reiterated its commitment to a broad definition of "support" in interpreting the state constitution. *Ballasiotes v. Gardner,* 97 Wn.2d 191, 199, 642 P.2d 397 (1982). As mentioned, a primary purpose of the Act is to produce the "maximum amount of net revenues to the state." RCW 67.70.040(1). Petitioner contends that the Act does not support existing state institutions, but only supports a new institution, the lottery commission. *See State ex rel. Burt v. Hutchinson,* 173 Wash. 72, 75–76, 21 P.2d

514 (1933). That argument simply misconstrues the purpose of the Act: it is designed to produce revenue for the state general fund which in turn supports all of the existing state institutions. Similarly, these funds certainly are "necessary" for the support of government as required under this court's most recent analysis of Const. art. 2, § 1(b). *Ballasiotes v. Gardner, supra* at 199. Accordingly, we hold that the lottery act is within the meaning of the "support" exception to the 7th amendment and is not subject to the referendum process.

Finally, respondents' request for attorney fees is denied because petitioner's claims are not so clearly unfounded as to demonstrate "bad faith or wantonness." *PUD 1 v. Kottsick,* 86 Wn.2d 388, 390, 545 P.2d 1 (1976).

WILLIAMS, C.J., ROSELLINI, STAFFORD, DOLLIVER, DORE, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.

UTTER, J. (dissenting)—I dissent to that portion of the majority opinion which concludes the lottery act was immune from referendum under the 7th amendment exceptions inasmuch as it contained an emergency clause exempting it from referendum. The majority correctly concludes that the 7th amendment contains two separate and distinct exceptions to the right of referendum and that one of these exempts those laws necessary for the support of state government. The majority opinion sweeps too broadly, however, in assuming that a measure is automatically within the terms of that exception if it generates revenue for the State. In those cases involving statutes allegedly exempted from referendum this court has divided about evenly in allowing and disallowing the referendum. *See* Trautman, *Initiative and Referendum in Washington: A Survey,* 49 Wash. L. Rev. 55, 74 n.73 (1973). This is a result of the court's recognition of "a most delicate balance between the emergent powers of the legislature and the people's right of referendum." *State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 777, 380 P.2d 735 (1963).

Petitioner correctly argues here that the assistance provided by the proposed lottery is not immediate enough in character to justify the suspension of the people's right of referendum. Similarly, the lottery is not solely for the support of state government, unlike "support" measures this court has previously considered. *See* cases cited in Trautman, at 74 n.73. Where a major purpose of the bill is other than support, the support clause does not apply. The case of *State ex rel. Burt v. Hutchinson,* 173 Wash. 72, 21 P.2d 514 (1933) is strikingly analogous. That case involved a bill legalizing horse racing and providing for fees to be collected by the State. *See Hutchinson,* at 73. The court rejected the State's assertion that this bill was to support state government, concluding:

> [I]t seems clear to us that the creation of a fund for "old age pensions" is a mere incident to the Horse Racing act; that the purpose of that act is to legalize horse racing and permit wagering by pari–mutuel machines. This is neither a police measure, nor an appropriation act, nor an act in support of an existing state institution.

*Hutchinson,* at 75–76.

If the State were to receive *immediate* benefit from the lottery, or if it was *solely* for the support of state government, the argument might be different. Such is not the case, however, and in maintaining the balance between the emergent powers of the Legislature and the people's right of referendum, I would in this case hold in favor of the people's right of referendum.